# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

In re:

ABENGOA BIOENERGY BIOMASS OF
KANSAS, LLC,

        *Debtor.*

DRIVETRAIN, LLC, as Liquidating Trustee
for Abengoa Bioenergy US Holding, LLC, et
al.,

        *Appellant,*

  vs.

MARK D. KOZEL, as Liquidating Trustee of
the ABBK Liquidating Trust,

        *Appellee.*

Case No. 18-cv-1055-EFM

## MEMORANDUM AND ORDER

On February 8, 2018, U.S. Bankruptcy Judge Robert E. Nugent entered a Memorandum

and Opinion ("Opinion") confirming Debtor Abengoa Bioenergy Biomass of Kansas, LLC's

("ABBK") plan of liquidation and overruling the objections to the plan filed by Drivetrain, LLC,

as Liquidating Trustee for Abengoa Bioenergy US Holding, LLC, et al. On February 16, 2018,

Drivetrain filed a notice of appeal of the Opinion, as well as a separate notice of appeal of the not-

yet-filed order[1] confirming the debtor's plan of liquidation pursuant to Chapter 11 of the Bankruptcy Code. This Court consolidated the appeals on March 5, 2018. The substantive issues on appeal have not yet been fully briefed, and the case is not yet ripe for review on the merits. This matter comes before the Court on Drivetrain's Motion for Stay Pending Appeal (Doc. 24). For the reasons detailed below, the Court denies Drivetrain's motion.

## I.     Factual and Procedural Background

On March 23, 2016, creditors of ABBK filed a Chapter 7 involuntary petition against ABBK in the U.S. Bankruptcy Court for the District of Kansas. On April 8, 2016, the Bankruptcy Court granted ABBK's motion filed pursuant to 11 U.S.C. § 706(a), and ordered that the involuntary Chapter 7 case be converted to a voluntary Chapter 11 case. ABBK filed its liquidating plan (the "Plan") and Disclosure Statement on April 14, 2017. The Plan includes four classes of claims: (1) secured claims, (2) general unsecured (third-party) claims, (3) unsecured intercompany claims, and (4) equity interests. Although classes 2 and 3 are both impaired under the Plan, creditors in Class 2 are to be paid *pro rata*, while creditors in Class 3 are to receive nothing. The Court approved ABBK's Amended Disclosure Statement in May 2017, set an evidentiary hearing to consider confirmation of the Plan for August 2017, set the last day to file objections to the Plan as July 7, 2017, and fixed July 7, 2017, as the last day for receipt of acceptances or rejections of the Plan. The unsecured creditors in Class 2 accepted ABBK's Plan. Those creditors in Class 3 were deemed as denying the Plan.

---

[1] Judge Nugent issued the Order Confirming Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code on March 29, 2018.

Shortly before ABBK's bankruptcy proceedings began, in February 2016, numerous Abengoa affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Missouri (the "Missouri bankruptcy proceedings"). On June 6, 2017, Drivetrain was appointed as the Missouri Liquidating Trustee under the Missouri plan. Under the trust agreement appointing Drivetrain, Drivetrain retained the power and authority to take all actions that may be taken by any officer of the Missouri debtors, including the right to prosecute any causes of action held by the Missouri debtors. The instant appeal revolves around intercompany claims held by four of the Missouri debtors. These claims are held by Abengoa Bioenergy Company, LLC ("ABC"), Abengoa Bioenergy Engineering & Construction, LLC ("ABEC"), Abengoa Bioenergy Trading, LLC ("ABT"), and Abengoa Bioenergy Outsourcing, LLC ("ABO") (collectively, the "Missouri Debtors"[2]).

Acting as the liquidating trustee for the Missouri bankruptcy proceedings, Drivetrain filed an objection to confirmation of ABBK's Plan on July 7, 2017, as well as a competing plan of liquidation that provided for payment of the four Missouri Debtors' claims on par with trade creditors' claims, but separately classified other intercompany claims of Abengoa entities in a lower class. Drivetrain's plan received few votes.

---

[2] Although the Missouri bankruptcy proceedings involved more than these four debtors, for purposes of this litigation the term "Missouri Debtors" refers only to the four debtors that Drivetrain argues should have their claims included and paid on par with third-party unsecured general trade creditors.

*Confirmation of ABBK's proposed Plan*

The Bankruptcy Court held a confirmation hearing on ABBK's Plan on October 25 and 26, 2017, and issued its Opinion approving the Plan on February 8, 2018. The following paragraphs summarize excerpts from the findings of fact made by the Bankruptcy Court:[3]

- ABBK is one of over 700 affiliates and subsidiaries in a global concern, Abengoa, S.A., a Spanish corporation. ABBK is part of Abengoa's U.S. bioenergy group, and is wholly owned by Abengoa Bioenergy Hybrid of Kansas ("ABHK"), a Kansas limited liability company.

- ABBK's sibling affiliates include Abengoa Bioenergy Company, LLC ("ABC"), Abengoa Bioenergy Engineering & Construction, LLC ("ABEC"), Abengoa Bioenergy Trading, LLC ("ABT"), and Abengoa Bioenergy Outsourcing, LLC ("ABO"), all of whom are part of the bioenergy group and Chapter 11 debtors in Missouri (collectively the "Missouri Debtors"). Many of the U.S. Abengoa bioenergy affiliates did business with each other, including ABBK with the Missouri Debtors.

- ABBK built a plant in Hugoton, Kansas, as a demonstration project to be used by its upstream corporate parents to demonstrate their design-build capabilities and new technology developed in the alternative fuels and power cogeneration fields. The initial construction was funded in part by a $95 million grant and a $45 million loan guaranty by the U.S. Department of Energy ("DOE"). ABBK substantially completed the plant in late 2014, but only after extensive cost overruns. ABBK experienced operational and equipment problems, and although the Hugoton plant produced 75,000 gallons of ethanol in 2015, it never approached commercial viability. While ABBK was not intended to be a revenue producer and was not expected to cash flow until the plant construction became operational in 2015, ABBK never generated significant cash flow and the Hugoton plant was never fully operational prior to the bankruptcy filing.

- In November 2016, ABBK sold the Hugoton plant, its principal asset (a 25-million-gallon capacity, second-generation cellulosic ethanol and cogeneration plant) for approximately $48.5 million.

- ABBK and the Missouri Debtors were managed by the same board of directors and officers, had the same general counsel, and shared back office operations including accounting, legal, administrative, IT and other services. The same law firm, DLA

---

[3] The Bankruptcy Court's findings of fact span approximately 29 pages of its 44-page Opinion. Although the Court does not decide the merits of Drivetrain's appeal here, the Court notes that any mixed questions of fact and law or legal conclusions contained in the "findings of fact" section, will be reviewed under the proper standard of review (e.g., de novo for legal conclusions) regardless of its placement in the "findings of fact" section.

Piper, represented ABBK, the Missouri Debtors, and the Delaware Debtors[4] in their respective bankruptcy cases, and Armstrong Teasdale is ABBK's co-counsel in both the Kansas and Missouri bankruptcy cases.

- ABBK had written contracts with ABO, ABEC, and ABT.  Undisputed testimony, however, explained that these written contracts were prepared only as a formality to satisfy the DOE's requirements for ABBK to obtain the DOE loan guaranty.  While Drivetrain had not located the written agreement between ABC and ABBK at the time of trial, ABBK did not deny the existence of that agreement and the consistent treatment of the loans on ABC's and ABBK's books suggested the existence of some form of agreement or protocol.

- ABC holds the largest intercompany claim at $55,044,663.41.  ABC did not report any loans payable by ABBK in its 2014 audited financial statement.  Significant "lending" only began in 2015 when ABBK had exhausted the DOE funds and grew more reliant on other affiliates and Abengoa, S.A. to fund the completion, start up, and commissioning of the Hugoton plant.  Drivetrain offered testimony from Matthew Diaz, a distressed business specialist from FTI Consulting, who prepared a summary of itemized advances and repayments for 2015 between ABBK and ABC.  There is only one repayment noted in Diaz's summary—ABBK provided ABC with a $460,000 payment (without interest) in March 2015.  No further payments were made or, based on the record before the Bankruptcy Court, demanded.  ABC booked credit transactions and funds deposited in ABBK's accounts as loans, akin to operating loans without interest, repayment, and maturity terms.  ABBK's Executive Vice President described the flow of funds as follows:  ABBK would ask ABO for money for some purpose.  If ABO could not source that money domestically, it would request a draw from Central Treasury in Seville, Spain.  If approved, the funds would be disbursed to ABC, who would then disburse the funds to ABBK.  He described ABBK as being "totally one hundred percent dependent on . . . the affiliates and the corporate entity."  By 2015, ABBK requested funds for utilities and other essential services "to keep the lights on."  Drivetrain's 30(b)(6) representative described ABC's essential function "as the bank for the [b]ioenergy companies."

- ABEC provided engineering and construction management services to ABBK under a written agreement and holds a claim for $1,883,354.84.  The agreement provided for services to be rendered and billed monthly with set hourly rates to be charged by ABEC depending on the nature of the services rendered.  Monthly invoices would be submitted and were payable within two days of billing.  The invoices referenced in Diaz's report contained summaries of amounts billed, but no hourly charge detail or

---

[4] Abengoa and several of its Spanish subsidiaries and affiliates filed a proceeding under Article 5bis of the Spanish Insolvency Act.  This foreign proceeding was recognized in a Chapter 15 filing in Delaware.  Abeinsa Holding Inc. and other related subsidiaries and affiliates (including ABHK) filed voluntary Chapter 11 cases in the District of Delaware in late March and early April of 2016.

description of services. And it did not appear that ABEC ever made a demand for payment, even though all amounts were payable on net two-day terms.

- ABT has a claim for $10,905,104.17 under its contract to procure and supply ABBK with biomass for the plant. ABBK did not make any payment on the parties' September 18, 2013, contract from August 2014 forward. ABT invoiced ABBK for each shipment of biomass during that period—some of its invoices included a contractual $1/ton fee, and others did not include this contractual fee. Had ABT not paid for the biomass it delivered, its suppliers would have been unsecured creditors of ABBK.

- ABO filed a claim for $1,617,790.74 for operation and financial services rendered to ABBK. Under the parties September 13, 2013, agreement, ABO was to provide ABBK a suite of services that included human resources, office furniture and rent, IT services, legal services, insurance, and aviation. The agreement would remain in effect until December 31, 2028, or the termination of the DOE loan guaranty agreement. The agreement fixed an annual fee of $535,000—an amount to be adjusted in subsequent years—and ABBK made no payments to ABO during the year preceding the bankruptcy filing.

- The Missouri Debtors' intercompany claims are different from those of non-affiliate Class 2 creditors.

- The Missouri Debtors' claims have several things in common: (1) all arose while they shared management with ABBK and knew the status of the Hugoton plant and ABBK's financial condition, (2) three, if not four, of them are grounded on written contracts required by the DOE as a condition of its loan guaranty to ABBK—nothing suggested they were the product of any arm's length bargaining, (3) the liquidation of each is based on book entries, e-mail threads, wire transfers, and in some cases, other source documents such as invoices, (4) only the issuing of invoices and direct payments make these claims look similar to ordinary trade creditor claims, (5) despite scrupulous documentation, no documented demands for payment or collection efforts were made, and (6) none of the affiliates harbored any expectation of payment from ABBK, even when the obligations were incurred.

- No prepetition efforts were made by ABT to collect for the biomass it delivered; likewise, ABC, ABEC, and ABO took no measures to collect or enforce the debtor's obligations to them. The affiliates knew of ABBK's condition when debts were incurred, they understood ABBK's dependence upon them, and they understood that ABBK was a demonstration project—not a revenue-producing entity like other bioenergy affiliates that operated first generation plants. This understanding was facilitated by the board meetings among the shared leadership of the entities at which ABBK's condition was discussed. ABBK's Executive Vice President testified that ABBK and the other bioenergy affiliates operated in an integrated manner, which included sharing the same management.

- The proponents of the plans in the Missouri and Delaware bankruptcy proceedings, with few exceptions, separately classified intercompany claims below unsecured third-party claims and denied payment of those claims. The Delaware plan denied distribution to any intercompany claims except that ABC's claim against ABHK was reserved. The Missouri plan subordinated all intercompany claims and denied them distribution, except for distributions to ABBK on account of its claims. ABBK's Plan subordinates all intercompany claims with no exceptions.

- ABBK's Executive Vice President testified that the complexity of intercompany transfers made it more expeditious to classify them below third-party claims. He also testified that none of the affiliates ever expected to be paid, particularly after the beginning of 2015 when the Hugoton project became plagued with problems and "everybody" knew it would not be profitable. Although Timothy Daileader, Drivetrain's principal, also testified as to the reasons for different treatment of intercompany claims in the Missouri and Delaware bankruptcy cases, the Bankruptcy Court accepted ABBK's Executive Vice President's testimony regarding why it separately classified intercompany claims.

- Drivetrain argued that the Missouri Debtors' claims were based on extensions of credit to ABBK, without which ABBK would have been forced to rely on third-party credit, making these claims the equivalent of non-affiliate claims. Given ABBK's start-up status, however, unsecured third-party credit likely would not have been available to ABBK, and ABBK's assets could not be encumbered without the DOE's consent. ABBK's affiliates were its only likely sources of working capital or operating credit.

- Drivetrain's distressed business specialist, Diaz, testified that the intercompany claims were incurred for valid contractual obligations and because ABBK's books and records reflected as much, they should be treated on par with non-affiliate claims. He relied on internal records to show that ABC tracked fund outlays to ABBK, accrued interest on these outlays, and, from time to time, requested their repayment. These outlays were consistently booked as "short term loans." Diaz did not go back to Spain to view the flow of money among the 700 entities. He did not consider the relationship among the affiliates as complex or unusual, and opined that the claims were "good claims."

- ABBK and the Kansas Committee stipulated to the terms of an order providing for a Key Employee Incentive Program ("KEIP"), which included that all intercompany claims were to be subordinated to the claims of trade creditors. While the Missouri Debtors were not party to the stipulation, their plan recognized the Kansas KEIP priority over the Missouri creditors. It provided that any funds recovered from ABBK's estate by the liquidating trustee on account of the Missouri Debtors' claims would be paid only after the KEIP claims are paid. The Missouri Debtors' plan, as corrected, was filed before ABBK's plan and provides for the subordination of all intercompany claims (except those of ABBK).

- The similarity of the plan and release provisions in the other bankruptcy proceedings involving Abengoa entities supports ABBK's contention that, at least among the debtors, there was an understanding that each other's debts would be released and not paid (except where specified). The ABBK Plan release, however, is the only release to specifically refer to intercompany or affiliate claims. ABBK's Executive Vice President testified that subordination of intercompany claims was "part of the strategy from the beginning . . . that the [shared bioenergy] management team had from the time that these cases were filed, probably from the beginning of 2016." This consensus, reached among ABBK's Executive Vice President, the companies' CEO at the time, general counsel of the bioenergy group, and possibly one other person, was not reduced to writing, but was "reflected in the disclosure statement." This testimony was uncontroverted.

- The evidence of a subordination agreement is not based solely upon the testimony of ABBK's witness. Sam Star, Drivetrain's Rule 30(b)(6) designee, acknowledged that, given the experimental nature of the Hugoton project, the intercompany claimants expected repayment of the intercompany obligations only if and when the plant was completed and became operational. That did not occur. The Missouri Debtors' continuation to fund ABBK when they knew the state of ABBK's affairs is circumstantial evidence consistent with the subordinated treatment of affiliates' intercompany claims.

- ABBK proved that its motivation to separately classify and treat the Missouri Debtors and other affiliate intercompany creditors' claims was sincere.

The Bankruptcy Court rejected Drivetrain's legal arguments in opposition to confirmation of the Plan. First, it held that separate classification of the affiliate intercompany claims is permissible under 11 U.S.C. § 1122(a) as "[n]othing in the bankruptcy code prohibits the separate classification of like claims into different classes so long as that is not done for the purpose of gerrymandering voting on the plan." The Bankruptcy Court found that ABBK demonstrated both (1) the uniqueness of the affiliate claims by virtue of their shared ownership, management, and objectives, as well as (2) the subordination understanding among the affiliates.

Second, it held that the Plan did not separately classify the intercompany claims for the purpose of gerrymandering. In rejecting Drivetrain's gerrymandering argument, the Bankruptcy Court noted that the intercompany claims were separately classified because they are dissimilar

from the third-party trade creditor claims, and alternatively, even if they were substantially similar, there is no evidence that the separate classification was motivated by gerrymandering. Rather, when the Plan was filed, the Missouri Debtors remained debtors in possession, were still managed by the same individuals as ABBK, and shared the same general counsel, and were represented in court by the same lawyer. When the Plan was filed, the shared management team agreed to the proposed classification and treatment of intercompany claims. Thus, there was no tactical reason for ABBK to seek to differently treat a "blocking" unsecured claim. Also, the Plan honored an agreement that third-party trade creditors and vendors would be paid ahead of intercompany claims.

Third, the Bankruptcy Court held that ABBK's Plan satisfied the best interests of creditors test under § 1129(a)(7). It held that "[e]ven without considering whether the Delaware, Missouri, and Kansas debtors agreed that intercompany debt would be subordinated, my 'rational speculation' must certainly include the likelihood that a chapter 7 trustee would question paying the claims of four affiliated companies who shared information, management, and objectives at par with unaffiliated and less informed third-party creditors." Further, based on its factual conclusion that ABBK shared an intention with the Delaware and Missouri debtors to subordinate the claims, the Bankruptcy Court concluded that said agreement would be honored under § 510(a).

Fourth, the Bankruptcy Court concluded that the separate classification of intercompany claims below general unsecured claims does not amount to unfair discrimination in violation of § 1129(b)(1) under any of several tests typically employed by courts in this and other circuits. Fifth, it concluded that the Plan complies with the absolute priority rule found in § 1129(b)(2)(B) because creditors in class 4 will not receive any proceeds or distributions under the Plan. Finally,

the Bankruptcy Court found that the Plan was proposed in good faith and complies with all requirements of § 1129(a), (b)(1), and (b)(2).

*Drivetrain's Motion to Stay Filed in the Bankruptcy Court*

As required by Fed. R. of Bankr. P. 8007, Drivetrain filed with the Bankruptcy Court a motion to stay implementation of the confirmation order pending appeal. The Bankruptcy Court denied Drivetrain's motion. After recognizing the applicable factors governing motions to stay, the Bankruptcy Court concluded that none of the factors weighed in favor of granting a stay. With regard to the likelihood of success on the merits, the Bankruptcy Court found that Drivetrain failed to carry its burden and made the following points:

- The factual findings have ample record support, and ABBK's witnesses were more credible and persuasive on critical issues than Drivetrain's witnesses.

- It properly applied the § 1129(a)(7) best interests of creditors test, which requires the plan proponent to show that a creditor that has not accepted the plan would receive no less under it than if the estate's assets were liquidated in a Chapter 7 case.

- Drivetrain's Due Process arguments lacked merit as it could not claim that it did not have notice of what was at stake or that it was deprived of the opportunity to appear and be heard at a two-day trial concerning the Debtor's plan, preceded by an actively managed pretrial process.

- Factual findings supporting the conclusion that the debtors corporately agreed that their claims would be paid after those of unaffiliated third parties, if at all, has support in the record and is unlikely to be found clearly erroneous.

- The Plan properly classified the intercompany claims separate from non-affiliate general unsecured claims because (1) the claims are dissimilar and § 1122(a) only permits substantially similar claims to be classified together and (2) even if the claims were substantially similar, separate classification is permitted so long as it is not for an improper purpose (gerrymandering) and the Plan did not separately classify intercompany claims for an improper purpose.

- It did not abuse its discretion in refusing to accept testimony regarding the contents of an off-record interview conducted by Drivetrain's counsel in Spain as inadmissible

-10-

hearsay, and regardless, if it had admitted the statement, it would not have affected its decision.

- The Plan did not unfairly discriminate against intercompany claims, and Drivetrain's likelihood of success in showing that the Court erred in its legal determination or made a clearly erroneous factual finding is low.

The Bankruptcy Court also determined that the remaining stay factors did not weigh in Drivetrain's favor. It held that the hazard of mootness—in the event consummation of the plan renders the appeal moot—in and of itself, is not sufficient to show irreparable harm. Further, even if Drivetrain is successful on appeal, this does not mean Drivetrain will automatically obtain a distribution as the case instead would be remanded for further proceedings.

Next, the Bankruptcy Court noted that the non-affiliate creditors will be forced to wait for years while the appeal unfolds, watching the pot shrink, and that significant delay in the distribution to creditors under a plan constitutes substantial harm to other parties. It concluded that the harm to third parties heavily weighed against granting a stay. Finally, the Bankruptcy Court concluded that the public interest would not be served by a stay. This conclusion appears to be premised on two considerations: (1) that the just, speedy, and efficient resolution of commercial disputes is the primary goal of bankruptcy courts and (2) that this case involves a real health, environmental, and safety risk (including fire risk) to the citizens of Stevens County because ABBK abandoned 60,000 tons of biomass that is baled on open ground and ABBK's creditors need funds to remove the abandoned biomass.

*Proceedings before this Court*

Drivetrain elected to have its appeal of the Bankruptcy Court's decision heard by this Court, pursuant to Fed. R. Bankr. P. 8005. On February 16, 2018, it filed a notice of appeal of the Bankruptcy Court's Opinion, and filed a separate notice of appeal of the not-yet-filed order

confirming the Plan. This Court consolidated the appeals on March 5, 2018. Drivetrain's appeal has yet to be fully briefed.

This action is currently before the Court on Drivetrain's motion to stay enforcement and implementation of the confirmed Plan pending resolution of this appeal. Mark D. Kozel, as the liquidating trustee of the ABBK Liquidating Trust, opposes Drivetrain's request. After filing its motion to stay, Drivetrain also filed an emergency motion for a temporary stay pending the Court's ruling on the current motion. The Court held a hearing on Drivetrain's emergency motion on April 6, 2018. It denied Drivetrain's request for a temporary stay, but granted its request for expedited briefing and hearing of the motion to stay.

## II.    Legal Standard

Under Fed. R. Bankr. P. 8005, a party appealing a bankruptcy court's decision may elect to have an appeal heard by the district court. Rule 8007 allows a party to petition this Court for a stay of a confirmation order pending the appeal of that order. A motion to stay filed in this Court on direct appeal must (1) "show that moving first in the bankruptcy court would be impracticable," or (2) "if a motion was made in the bankruptcy court, either state that the court has not yet ruled on the motion, or state that the court has ruled and set out any reasons given for the ruling."[5]

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,' " and the party seeking the stay "bears the burden of showing that the circumstances justify" it.[6] Indeed, the Court will not enter a stay as "a matter of right, even if irreparable injury might

---

[5] Fed. R. Bankr. P. 8007(b)(2).

[6] *Nken v. Holder*, 556 U.S. 418, 427, 433-34 (2009) (quoting *Virginia Pet. Jobbers Assn. v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

otherwise result to the appellant."[7]  Although the Court has discretion in determining whether to issue a stay, it must consider four factors when exercising this discretion.[8]  These factors include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[9] "The first two factors . . . are the most critical."[10]

### III.    Analysis

As an initial matter, Drivetrain has failed to fully comply with Fed. R. Bankr. P. 8007. While Drivetrain acknowledges that the Bankruptcy Court denied its motion to stay pending appeal, it fails to identify the reasons given by the Bankruptcy Court for its denial of Drivetrain's motion.  Instead, it simply notes that "[t]his Court does not afford any deference to the Bankruptcy Court's ruling on the similar stay motion that was filed in the Bankruptcy Court," and "the Bankruptcy Court appears to have confirmed that the 'subordination agreement' it found was 'struck' post-petition."  While this Court owes no deference to the Bankruptcy Court's decision in deciding the current motion, it may nevertheless look to the Bankruptcy Court's decision to inform its analysis,[11] and regardless, Rule 8007 requires Drivetrain to state the Bankruptcy Court's reasons

---

[7] *Id*. at 427 (quotation omitted).

[8] *Id*. at 434.

[9] *Id*. at 426 (quotation omitted).

[10] *Id*. at 434.

[11] *See In re Paige*, 685 F.3d 1160, 1178 (10th Cir. 2012) (citation omitted).

for denying the prior motion to stay.  The Court does not deny Drivetrain's motion on this ground, but advises the parties to carefully review and follow the rules applicable to this proceeding.[12]

## A.    Factor (1) – Likelihood of success on the merits of its appeal

As stated above, the party seeking a stay must make "a strong showing that [it] is likely to succeed on the merits."  "It is not enough that the chance of success on the merits be better than negligible;" nor is it sufficient for the petitioner to show a "mere possibility of relief."[13]  Although this Court does not decide the merits of Drivetrain's appeal here, it must analyze whether Drivetrain has satisfied its burden to show that it is likely to succeed on the merits.  Accordingly, the Court briefly summarizes the applicable standards of review that will govern Drivetrain's appeal.  The Court will review factual findings for clear error, will review legal conclusions de novo, and the standard applied to mixed questions of law and fact will depend on the nature of the mixed question.[14]  Further, the Court will not reverse the Bankruptcy Court's decision unless any errors resulted in prejudice to Drivetrain.[15]

In its memorandum in support of the current motion, Drivetrain identifies the "most significant" errors made by the Bankruptcy Court as follows: (1) it committed legal error in holding

---

[12] Although this appeal is in its infancy, Drivetrain has thus far failed to comply with Fed. R. Bankr. P. 8007, Fed. R. Bankr. P. 8013(a)(1) (by seeking relief through a letter to the Court instead of by filing a motion), and Fed. R. Bankr. P. 8013(d) (by filing an emergency motion without complying with all requirements relating to emergency motions).  While the Court has not denied any requests for relief because of failures to comply with these Rules, the Court's patience in this regard is limited and the parties are instructed to consult and comply with all rules applicable to this proceeding in future filings and requests for relief.

[13] *Nken*, 556 U.S. at 434 (quotations omitted).

[14] *See U.S. Bank Nat'l Assn. ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 965-66 (2018).  For mixed questions, the Court looks to the "nature of the mixed question . . . and which kind of court (bankruptcy or appellate) is better suited to resolve it"—in other words, whether answering the question "entails primarily legal or factual work."  *Id*. at 966-67.

[15] *In re Sunflower Racing, Inc.*, 221 B.R. 940, 943 (D. Kan. 1998).

that ABBK entered into an oral subordination agreement with the Missouri Debtors, where such agreement was not disclosed in the Debtor's Plan; (2) it committed legal error in holding that there was evidence from which it could be found that ABBK entered into an oral subordination agreement with and among the Missouri Debtors; (3) its finding of a subordination agreement was clearly erroneous; and (4) it committed legal error in holding that ABBK's Plan satisfied the "best interests of the creditors test."[16]  These arguments may be divided into two general categories: arguments regarding (1) the subordination agreement and (2) whether the Plan satisfied the "best interests of creditors test."

> *1.   Drivetrain has not met its burden to show that it is likely to prevail in arguing that the Bankruptcy Court made clearly erroneous factual findings or committed legal error with regard to its oral subordination agreement conclusions*

> a.   Failure to disclose subordination agreement and Due Process concerns

In short, Drivetrain argues that the Bankruptcy Court erred in finding the existence of an oral subordination agreement because ABBK had not previously disclosed the existence of such an agreement in its Plan, disclosure statements, or otherwise, and that Drivetrain lacked adequate notice of such a claim.  Drivetrain cites no legal authority for its proposition that a party "seeking to subordinate claims must either expressly provide for and identify the basis supporting such subordination in a plan, or must initiate adversary proceedings," nor does it cite authority

---

[16] Doc. 27, pp. 18-32.  Drivetrain devotes approximately two-and-a-half pages of its reply brief to argue that the confirmation plan, as interpreted by the Bankruptcy Court, violates § 1129 of the Bankruptcy Code because any surplus would not go to the Missouri Debtors.  Drivetrain only briefly mentions this argument in its preliminary statement and a footnote in its opening brief; Kozel provides a similarly cursory response.  Drivetrain's reply provides various factual assertions to support its prior conclusory statements and Kozel has not had an opportunity to respond to the factual assertions or characterizations.  The Court declines to address Drivetrain's arguments on this point, given that the only development of the issue appears in Drivetrain's reply brief and Courts in this district generally refuse to consider issues first presented in a reply brief.  The Court notes, however, that Drivetrain appears to have failed to meet its burden with regard to this argument, and, even if Drivetrain had shown that its arguments are correct on the merits, in considering the motion as a whole, along with all of the stay factors, this alone would be insufficient for the Court to grant a stay.

suggesting that a failure to do so constitutes grounds for reversal. Its arguments do not satisfy its burden at this stage.

To the extent its relies on "a fundamental notion of due process"—that a party seeking to subordinate another party's claim must provide "notice as to the basis for that subordination, and a meaningful opportunity to meet those allegations"—it has not met its burden to show that it is likely to succeed on the merits of this claim. A review of the transcript of the confirmation hearing demonstrates that Drivetrain knew ABBK intended to argue that the Missouri Debtors had agreed to treat affiliate/intercompany claims as junior to non-affiliate claims. In its opening statement, Drivetrain summarized ABBK's assertions to include that the Missouri Debtors "knew more about the debtor's financials than third-party creditors; they did not expect repayment unless Hugoton became operational; they routinely postponed or forgave treatment of claims; [and] they always regarded intercompany claims as junior to other unsecured creditors. . ."[17]  Drivetrain has not explained why ABBK's failure to specifically cite § 510(a) of the Bankruptcy Code results in a violation of Due Process where Drivetrain clearly had notice that ABBK sought subordination of the Missouri Debtors' claims based, at least in part, on their prior agreement to treat such claims as junior.

b.  No legal basis to find an oral subordination agreement

Drivetrain argues that, with regard to the oral subordination agreement, the Bankruptcy Court failed to find the existence of the elements of an enforceable oral agreement. Further, it argues that the agreement is precluded, as a matter of law, by the written contracts between the

---

[17] Doc. 25-1, p. 42.

parties.  The Court is not persuaded that Drivetrain has shown a likelihood of success on the merits of these arguments.

First, while the Bankruptcy Court did not painstakingly address each element of a contract, it recognized that a subordination agreement requires a "meeting of the minds" on the essential terms and concluded that such an agreement existed.  Drivetrain attacks the Bankruptcy Court's determinations by noting that it did not identify the specific time when the parties reached the agreement, that no officer, director, or employee of one of the Missouri Debtors testified that they entered a subordination agreement, and that any subordination agreement fails for lack of consideration.  Drivetrain cites no legal authority requiring the Bankruptcy Court to identify the specific date when the parties entered into an agreement; nor does it provide support for its suggestion that the Bankruptcy Court must have received testimony from the Missouri Debtors supporting the existence of a contract.  Further, its arguments regarding consideration do not suggest a likelihood of success.  A review of the Bankruptcy Court's factual findings suggests the presence of sufficient evidence in the Bankruptcy Court's factual findings to support consideration.[18]  Nothing before the Court suggests that the agreement to treat intercompany claims as junior to non-affiliate claims constitutes mere gratuity.

Second, Drivetrain has not demonstrated that it is likely to succeed on the merits of its argument that the contracts between ABBK and each of the Missouri Debtors preclude an oral subordination agreement.  While those contracts include no oral modification clauses, the scope of those agreements do not appear to extend to a subordination agreement—and Drivetrain does

---

[18] Drivetrain specifically addresses a lack of consideration only as to ABC and ABEC, claiming that ABBK did not have claims against ABC and ABEC and thus, ABC and ABEC received no consideration for agreeing to subordinate their claims against ABBK.

not attempt to explain how a subordination agreement would fall within the scope of the written contracts. Rather, it relies on general principles without attempting to apply those principles to the specific contracts at issue here.

      c.  Actions and evidence alleged to be inconsistent with a subordination agreement

Drivetrain identifies numerous actions as inconsistent with the existence of a subordination agreement and various pieces of testimony and evidence that allegedly dispel the existence of a subordination agreement. Ultimately, Drivetrain's allegations go to the weight of the evidence supporting the Bankruptcy Court's determination of a subordination agreement, and Drivetrain falls short of its burden to show that it is likely to succeed in demonstrating that the Bankruptcy Court's factual findings are clearly erroneous. Rather, it appears as though the Bankruptcy Court credited testimony and evidence presented by ABBK that conflicted with testimony and evidence presented by Drivetrain. That it weighed the evidence differently than Drivetrain would have does not make those findings clearly erroneous.

      d.  Drivetrain has failed to identify why the alleged errors require reversal

Drivetrain's motion to stay primarily attacks the Bankruptcy Court's determination that ABBK had entered into a subordination agreement with the Missouri Debtors. Indeed, Drivetrain spends the majority of its legal analysis explaining *how* the Bankruptcy Court erred in this particular determination. Drivetrain largely fails, however, to explain *why* the alleged error requires reversal of the Bankruptcy Court's order and Opinion.

This failure is significant where, as here, the Bankruptcy Court has provided alternate reasons for its conclusions.[19] For example, in determining that the Plan permissibly classified

---

[19] Drivetrain argues that it is telling that the subordination agreement pursuant to 11 U.S.C. § 510(a) is mentioned only once in the Bankruptcy Court's order denying its motion to stay "notwithstanding that this finding of

intercompany claims separate and apart from non-affiliated unsecured creditors, the Bankruptcy Court first noted that "ABBK separated non-affiliates' general unsecured claims from those of affiliates, arguing that third-party vendors lacked the unique access and knowledge that the affiliate creditors had by virtue of their shared ownership, management, and objectives." It continued to conclude that "ABBK demonstrated *both* the uniqueness of the affiliate claims *and* the subordination understanding among them," and that the affiliate and non-affiliate claims are dissimilar.

Further, in concluding that ABBK did not separately classify the claims for the purpose of gerrymandering, the Bankruptcy Court concluded (1) "the intercompany claims were separately classified because they are dissimilar from the third-party trade creditor claims" and (2) even if the claims were substantially similar, "there is no evidence that the separate classification was motivated by gerrymandering the plan voting." While in explaining its second finding the Bankruptcy Court cited the parties' subordination agreement, that analysis is unnecessary to its ultimate decision. Drivetrain's motion ignores the Bankruptcy Court's first finding—that the intercompany claims are dissimilar from non-affiliate claims—which alone is sufficient to conclude that ABBK did not engage in gerrymandering when it separately classified the claims. If the Bankruptcy Court properly found the claims as dissimilar, in other words not "substantially

---

a subordination agreement pursuant to § 510(a) was the centerpiece of the Bankruptcy Court's Opinion." The Court agrees that it is telling, but not for the same reason. Rather, it is telling because it further supports this Court's reading of the Opinion—that the Bankruptcy Court's findings in its Opinion regarding the subordination agreement do not play as central a role as advocated by Drivetrain.

similar" to the third-party trade creditors, the Bankruptcy Code generally prohibits classification of the affiliate and non-affiliate claims in the same class.[20]  Drivetrain does not address this issue.

Drivetrain largely ignores the Bankruptcy Court's alternate determinations and fails to explain why the Opinion should be reversed, even if this Court assumes that the Bankruptcy Court improperly concluded that ABBK had entered into a subordination agreement with the Missouri Debtors.  Regardless, as explained above, Drivetrain has failed to meet its burden to show a strong likelihood of success on the merits with regard to any of its arguments relating to the Bankruptcy Court's conclusions regarding the oral subordination agreement.

2.      *Best interests of the creditors test*

In order for the Bankruptcy Court to confirm a plan under the "best interests of the creditors test," each holder of a claim or interest of an impaired class must have either accepted the plan or "receive or retain under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."[21]  This provision of the Bankruptcy Code prevents confirmation of a plan under which a non-accepting, impaired creditor recovers less under the plan than if the debtor's property were liquidated under Chapter 7.  Drivetrain argues that ABBK's Plan does not satisfy this test because the Missouri Debtors receive nothing under the Plan, but in a Chapter 7 liquidation proceeding they would receive an 18.7% recovery.  Drivetrain relies on ABBK's liquidation analysis to support this argument.

---

[20] 11 U.S.C. § 1122(a) ("Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class *only if* such claim or interest is substantially similar to the other claims or interests of such class.") (emphasis added).

[21] 11 U.S.C. § 1129(a)(7).

In the proceedings below, the Bankruptcy Court entertained and rejected this same argument, noting that the best interests test requires it to "take into consideration the applicable rules of distribution of the estate under Chapter 7" and " 'engage in rational speculation' of what may occur in a chapter 7 liquidation."  It concluded that the Code would honor the affiliates' shared intention to subordinate the claims in question, and that, even without considering the agreement to subordinate intercompany claims, a hypothetical Chapter 7 trustee would question paying the Missouri Debtors claims based on the information available to the affiliated unsecured creditors and not available to the non-affiliated unsecured creditors.

Drivetrain argues that the Bankruptcy Court erred in its treatment of the liquidation analysis, claiming that ABBK's liquidation analysis "is a binding judicial admission that it cannot later disavow," and that, absent a challenge to the liquidation analysis, the Bankruptcy Court must accept the liquidation analysis in determining whether the best interests of creditors test has been met.  Drivetrain criticizes the Bankruptcy Court's exercise of engaging in rational speculation as to what a hypothetical Chapter 7 trustee would do in a Chapter 7 liquidation proceeding, and argues that the best interests of creditors test requires evidence and cannot be supplanted by speculation. Finally, it argues that the only evidence in the record concerning the best interests of the creditors test is ABBK's liquidation analysis, which states that the Missouri Debtors would fare better in a Chapter 7 liquidation.

     a.   Liquidation analysis as a judicial admission

Drivetrain's legal authority for its proposition that ABBK's liquidation analysis acts as a binding judicial admission does not persuade the Court that it is likely to succeed on the merits of

this argument.  The strongest authority for this proposition appears in *In re Morreale*,[22] but the Court does not find this case persuasive under the circumstances presented here.  There, the bankruptcy court rejected a debtor's rationale that its assets had a value twice as high as previously reported in a liquidation analysis.[23]  In doing so, it noted that statements in bankruptcy schedules are judicial admissions and concluded that statements in the debtor's liquidation analysis would be treated as evidentiary admissions, if not judicial admissions.  The central issue before the bankruptcy court there was whether the Chapter 7 debtor had legal standing to object to matters concerning the administration of his Chapter 7 bankruptcy estate.  It did not involve similar facts, did not address the best interests of creditors test, and did not provide any authority for treating a statement in a liquidation analysis as a binding admission.  The Court does not find *In re Morreale* persuasive, and Drivetrain does not present any other authority treating a liquidation analysis as a binding judicial admission.[24]

Unlike *In re Morreale*, here the Court is not faced with a dispute regarding the accuracy of financial figures contained in the liquidation analysis.  It is not currently disputed that if the Missouri Debtors' claims were treated on par with third-party unsecured creditors that the 18.7% recovery estimate is accurate.  Rather, the dispute is whether a Chapter 7 trustee would treat the

---

[22] 2015 WL 3897796 (Bankr. D. Colo. 2015).

[23] The debtor reported assets totaling just over $1 million in its liquidation analysis, and later attempted to claim that the liquidation value of his assets was between $2 and $2.4 million.  *Id.* at *4.

[24] Drivetrain's citations to *In re Goodell*, 2006 WL 23568 (Bankr. E.D. Pa. 2006) and *Southern Pacific Transportation Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373 (E.D. Tex. 2000) also do not support Drivetrain's assertions.  *In re Goodell* involved a statement made in schedules submitted under penalty of perjury.  Official Form 202 requires an individual authorized to act on behalf of a non-individual debtor to sign and submit a declaration under penalty of perjury for the schedules of assets and liabilities.  Drivetrain does not argue that ABBK submitted its liquidation analysis under penalty of perjury.  *Southern Pacific Transportation* also does not support Drivetrain's position as the appellate court determined that that bankruptcy court improperly relied on a dubious liquidation analysis.

Missouri Debtors' claims, and other intercompany claims, on par with unaffiliated unsecured creditors.  The relevant inquiry differs—it is not whether the numbers accurately reflect Drivetrain's state of affairs, but rather, what would happen in a hypothetical Chapter 7 liquidation.

b.  "Rational speculation" by the Bankruptcy Court

When describing the Bankruptcy Court's obligations in determining whether the best interests of creditors test has been met, Drivetrain admits that the bankruptcy court should "make 'an independent finding, based on the evidence and arguments presented, whether creditors will receive as much under the plan as they would in the hypothetical Chapter 7 liquidation.'  Bankruptcy courts should make such finding based on the record adduced at trial."  It then proceeds to criticize the Bankruptcy Court for analyzing what a hypothetical Chapter 7 trustee may have done in this case, and appears to argue that the only evidence in the record that the Bankruptcy Court could consider was the liquidation analysis.

Drivetrain has failed to demonstrate a likelihood of success on its argument that the Bankruptcy Court erred in its prediction that a Chapter 7 trustee would treat affiliate claims as subordinate to non-affiliate claims.  Numerous courts have recognized a bankruptcy court's authority to engage in such "rational speculation."[25]  Further, Drivetrain has not persuaded the Court that in predicting the results of a hypothetical Chapter 7 proceeding, the Bankruptcy Court should have ignored its determinations regarding the dissimilar nature of intercompany and third-

---

[25] *See, e.g.*, *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (recognizing "inherently speculative" nature of hypothetical chapter 7 analysis); *In re Sierra-Cal*, 210 B.R. 168, 172, 174 (Bankr. E.D. Cal. 1997) (noting that court will consider matters such as subordinations, and that "the court is entitled to view the entire record of the case and to engage in rational speculation about what would occur in a chapter 7 liquidation" and it "can hypothesize that certain claims would evoke the objection of a chapter 7 trustee and can speculate about the likely fate of such objections.").

party claims or its finding that affiliates agreed to treat intercompany claims as junior to unrelated third-party claims.

Drivetrain has failed to make a strong showing of a likelihood of success on the merits. Its attacks on the Bankruptcy Court's factual findings do not suggest a likelihood of success under the clearly erroneous standard of review. And, it has failed to muster support sufficient to demonstrate a likelihood of success on its legal arguments. Accordingly, the first factor weighs against granting Drivetrain's request for a stay pending appeal.

**B.      Factor (2) – Irreparable injury**

Drivetrain claims that it risks suffering irreparable injury in the absence of a stay because the Debtor's assets may be distributed, creating "a real risk of rendering [its] appeal moot." Drivetrain asserts that a challenge to a plan can become equitably moot as a result of an impossibility of "unscrambling the egg" once sufficient distributions are made. Drivetrain, however, makes no arguments specific to this case. Instead, Drivetrain essentially asks the Court to assume that its appeal will become moot, while neither addressing the requirements for equitable mootness nor suggesting why equitable mootness may be applicable to this case. It also does not address why, *in this case*, it would be impossible to "unscramble the egg" after distributions are made. Several courts "have held that the fact that an appeal may be rendered moot without a stay does not itself constitute irreparable harm."[26] Drivetrain makes no effort to explain how it will suffer irreparable injury in this case, and the cases cited in support of its argument are materially distinguishable.[27] In short, Drivetrain has failed to present information specific to this case to

---

[26] *In re Sunflower Racing, Inc.*, 225 B.R. 225, 228 (D. Kan. 1998) (collecting cases).

[27] *See In re Sunland, Inc.*, 507 B.R. 753 (Bankr. D.N.M. 2014) (entering stay appropriate where stay would halt the sale of specific property that the Bankruptcy Code specifically said could not be reversed even where the decision allowing the sale has been reversed on appeal); *In re Tribune Co.*, 477 B.R. 465 (Bankr. D. Del. 2012)

show that it will suffer irreparable injury if the Court does not impose a stay. Accordingly, this factor weighs against granting a stay.

## C.       Factor (3) – Harm to other parties

Drivetrain submits conclusory arguments in support of its claim that other parties will not suffer substantial harm if a stay is granted. It claims that a stay "will not unduly deplete the Debtor's estate," that "insignificant operating costs will not meaningfully deplete assets ultimately available for distribution," that "[t]he appellate process will not be unduly expensive or time consuming," that harm "to creditor recovery will be immaterial, if any," and that any harm to unsecured creditors will be "minimal." Without further context, these statements lack meaning and do not persuade the Court that third parties will not suffer substantial injury or harm.

The only concrete estimate of harm to other parties—or the lack thereof—provided by Drivetrain relates to the expected delay a stay will cause in the distribution of cash. It suggests that "[a] delay of *a few months* in distributing this cash will cause minimal, if any, inconvenience to other creditors." The Court rejects this estimate as unrealistically low. First, it seems likely that the Court's decision on the merits will be appealed—whether by Drivetrain or by Kozel—and even if Drivetrain succeeds on the merits and Kozel does not appeal, the case would be remanded for further proceedings. Neither scenario suggests that any delay will last only "a few months." Second, Drivetrain has previously estimated that litigation over its objections may "substantially

---

(discussing irreparable injury in the context of distribution of approximately $1.9 billion to thousands of creditors); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351 (S.D.N.Y. 2007) (noting that parties addressed feasibility of a disgorgement remedy in the event of a hypothetical reversal of an unstayed confirmation order, and concluding that disgorgement becomes impossible "once 111 million shares of freely tradeable TWC Stock are distributed to 14,000 parties, and more than 9.4 billion CVV Interests and $7.136 billion in cash are distributed to over 10,000 parties").

delay distributions" and last "for years given the appeal processes"—undermining its current assertion that any delay will last a mere "few months."[28]

Kozel's response, however, also fails to provide concrete examples of harm that other parties will endure if the Court grants Drivetrain's request. It argues that "continued depletion" and "increased administrative expenses" alone justify denial of Drivetrain's stay, and emphasize Drivetrain's alleged "scorched earth litigation tactics" will continue to deplete the bankruptcy estate. But it provides no detail as to the anticipated amount of depletion or administrative expenses that may be incurred. Kozel also notes that the bankruptcy proceedings commenced over two years ago and that creditors will be harmed by the continued deprivation of the use of their money, for which they receive no interest. While third-party creditors will clearly suffer some level of harm based on a continued delay in receiving payment, the extent of such harm is unclear. Accordingly, while this factor does not weigh in favor of a stay, it also does not clearly weigh against a stay. The Court treats this factor as neutral.

## D.    Factor (4) – The public interest

In addition to restating its arguments regarding the merits and alleged irreparable harm that will result to Drivetrain if the Court does not grant its motion, Drivetrain also argues that granting a stay will serve "the Bankruptcy Code's clear central policy of obtaining a maximum and

---

[28] In a letter to creditors identifying the reasons why Drivetrain's proposed plan of liquidation is superior to ABBK's Plan, Drivetrain included the following statement:

> **Third, you will get your money sooner**. If the Missouri Claims are contested, [Drivetrain] will be forced to litigate those claims as well as pursue its previously filed objection to the Debtor's Plan. Thus, in the event that creditors do not vote to approve the LT Plan, litigation over the allowance of the Missouri Claims will substantially delay distributions to Kansas general unsecured creditors, perhaps for years given the appeal processes, while the determination of the Missouri Claims winds its way through the courts.

Bankr. Dkt. 978, pp. 119-120.

equitable distribution for all creditors," as well as vindicate "the important public policy of providing [it] an effective right of appeal."  Further, it argues that the existence of significant legal issues makes the public interest "all the more compelling."  The Court is not persuaded that public interest concerns favor Drivetrain.

First, the Bankruptcy Code's policy of obtaining a maximum and equitable distribution for all creditors does not inevitably favor Drivetrain.  Unless Drivetrain correctly argues that it should share in the Debtor's estate, granting the stay would have the opposite effect and work a detriment to this central policy.[29]  As explained above, Drivetrain has failed to demonstrate a likelihood of success on the merits.  Accordingly, the Court cannot conclude that granting a stay would serve the Bankruptcy Code's policy of obtaining a maximum and equitable distribution for all creditors.

Second, that Drivetrain has a right to appeal the bankruptcy proceedings below does not weigh in favor of a stay here.  If that were the case, public policy concerns would almost always weigh in favor of a stay.  Further, Drivetrain has failed to explain (1) what makes the legal issues in this case particularly "significant" or (2) why the legal issues in this case make the public interest in a stay "all the more compelling."  In *Thiry v. Carlson*,[30] cited by Drivetrain in support of its argument, the legal issues presented questions of importance to the public as the issues related to the proper accommodations a state must make when confronted with claimed infringement of religious liberties.  Although Drivetrain artfully labels the issues in this case as "significant," it

---

[29] Drivetrain appears to concede this point as it argues *if* it "is right about the nature of its claims and the impermissible effect of the Debtor's Plan, its implementation would be at odds with the basic policy of equitable distribution for all creditors that underlies the Bankruptcy Code."  Doc. 27, p. 35.

[30] 891 F. Supp. 563, 567 (D. Kan. 1995).

fails to explain why the issues presented here relate to the public interest.  Drivetrain has not shown that the public interests favors a stay under the circumstances.

Further, the Court notes that Kozel presents information suggesting that certain creditors need to receive distributions in order to clean biomass that ABBK abandoned on their property and which poses a real health, environmental, and safety risk.  Drivetrain does not deny that such risk exists; rather, it implies that the Court should not consider this because Kozel provides no admissible evidence in support of this assertion, but instead relies on information provided at a non-evidentiary hearing before the Bankruptcy Court.  Further, it notes that the Bankruptcy Court's decision citing this matter is not entitled to deference, and creditors could seek relief from the Bankruptcy Court "if some public health risk affects one creditor's claim."  Drivetrain does not identify what relief such creditors may seek from the Bankruptcy Court if this Court imposes a stay on implementation of the Plan; nor does it deny the existence of a safety risk.[31]  The fact that some information, whether admissible in evidence or not, suggests that implementation of the Plan will allow for the clean-up of a public health, environmental, and safety risk to innocent third parties further buttresses the Court's decision that the public interest does not favor a stay.  This factor weighs against imposing a stay.

## IV.    Conclusion

Drivetrain has failed to persuade the Court that it should grant the requested stay.  It has not made a strong showing that it is likely to succeed on the merits of its appeal, and its arguments regarding irreparable injury lack specificity and require the Court to assume, without support, that

---

[31] Indeed, a review of the proceedings below confirms that ABBK did in fact abandon biomass on third parties' land.

events will unfold in a manner injurious to Drivetrain.  Although the Court has not been presented information quantifying the likely harm others will sustain if the Court grants Drivetrain's motion, the bankruptcy proceedings began over two years ago, and it is unlikely that Drivetrain's appeal will be quickly resolved.  Further, the public interest weighs against imposing a stay in this case. In summary, while the extent to which others will suffer harm is unclear, the remaining factors weigh against imposing a stay.  Accordingly, the Court denies Drivetrain's motion for stay pending appeal.

**IT IS THEREFORE ORDERED** that Drivetrain's Motion to Stay Pending Appeal (Doc. 24) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 12th day of June, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE