# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

In re:

ABENGOA BIOENERGY BIOMASS OF
KANSAS, LLC,

      *Debtor*.

_____

DRIVETRAIN, LLC, as Liquidating Trustee
for Abengoa Bioenergy US Holding, LLC, et
al.,

      *Appellant*,

 vs.

MARK D. KOZEL, as Liquidating Trustee of
the ABBK Liquidating Trust,

      *Appellee*.

Case No. 18-cv-1055-EFM

## MEMORANDUM AND ORDER

On February 8, 2018, U.S. Bankruptcy Judge Robert E. Nugent entered a Memorandum

and Opinion ("Opinion") confirming Debtor Abengoa Bioenergy Biomass of Kansas, LLC's

("ABBK") plan of liquidation (the "Plan") and overruling the objections to the Plan filed by

Drivetrain, LLC, as Liquidating Trustee for Abengoa Bioenergy US Holding, LLC, et al. On

February 16, 2018, Drivetrain filed a notice of appeal of the Opinion, as well as a separate notice

of appeal of the not-yet-filed Order[1] confirming the debtor's plan of liquidation pursuant to Chapter 11 of the Bankruptcy Code. This Court consolidated the appeals on March 5, 2018. The substantive issues on appeal have not been fully briefed,[2] and the case is not yet ripe for review on the merits. This matter comes before the Court on the ABBK Trustee's Motion to Dismiss Drivetrain's Appeal as Moot (Doc. 53). For the reasons detailed below, the Court grants the ABBK Trustee's Motion.

## I.    Factual and Procedural Background

On March 23, 2016, creditors of ABBK filed a Chapter 7 involuntary petition against ABBK in the U.S. Bankruptcy Court for the District of Kansas. On April 8, 2016, the Bankruptcy Court ordered that the case be converted to a voluntary Chapter 11 case. ABBK filed its Plan and Disclosure Statement on April 14, 2017. The Plan includes four classes of claims: (1) secured claims, (2) general unsecured (third-party) claims, (3) unsecured intercompany claims, and (4) equity interests. Although classes 2 and 3 are both impaired under the Plan, creditors in Class 2 are to be paid *pro rata*, while creditors in Class 3 are to receive nothing. The Court approved ABBK's Amended Disclosure Statement in May 2017, set an evidentiary hearing to consider confirmation of the Plan for August 2017, set the last day to file objections to the Plan as July 7, 2017, and fixed July 7, 2017, as the last day for receipt of acceptances or rejections of the Plan. The unsecured creditors in Class 2 accepted ABBK's Plan. The creditors in Class 3 were deemed as denying the Plan.

---

[1] Judge Nugent issued the Order Confirming Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code on March 29, 2018.

[2] Drivetrain has filed its Appellant's Brief (Doc. 46), but the parties jointly requested that the Court stay briefing on the appellate brief until the Court addressed the ABBK Trustee's current Motion.

Shortly before ABBK's bankruptcy proceedings began, in February 2016, numerous Abengoa affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Missouri (the "Missouri bankruptcy proceedings"). On June 6, 2017, Drivetrain was appointed as the Missouri Liquidating Trustee under the Missouri plan. Under the trust agreement appointing Drivetrain, Drivetrain retained the power and authority to take all actions that may be taken by any officer of the Missouri debtors, including the right to prosecute any causes of action held by the Missouri debtors. The instant appeal revolves around intercompany claims held by four of the Missouri debtors. These claims are held by Abengoa Bioenergy Company, LLC ("ABC"), Abengoa Bioenergy Engineering & Construction, LLC ("ABEC"), Abengoa Bioenergy Trading, LLC ("ABT"), and Abengoa Bioenergy Outsourcing, LLC ("ABO") (collectively, the "Missouri Debtors"). The Plan designates the Missouri Debtors' claims as Class 3 (Intercompany Claims) to receive no distribution. Among other points of contention, Drivetrain argues that these claims should have been treated the same as Class 2 (General Unsecured Claims) and receive a pro rata share of the liquidating trust cash.

Acting as the liquidating trustee for the Missouri bankruptcy proceedings, Drivetrain filed an objection to confirmation of ABBK's Plan on July 7, 2017, as well as a competing plan of liquidation that provided for payment of the four Missouri Debtors' claims on par with trade creditors' claims, but separately classified other intercompany claims of Abengoa entities in a lower class. Drivetrain's plan received few votes.

*Confirmation of ABBK's proposed Plan*

The Bankruptcy Court held a confirmation hearing on ABBK's Plan on October 25 and 26, 2017, and issued its Opinion approving the Plan on February 8, 2018. The following paragraphs summarize excerpts from the findings of fact made by the Bankruptcy Court:[3]

- ABBK is one of over 700 affiliates and subsidiaries in a global concern, Abengoa, S.A., a Spanish corporation. ABBK is part of Abengoa's U.S. bioenergy group, and is wholly owned by Abengoa Bioenergy Hybrid of Kansas ("ABHK"), a Kansas limited liability company.

- ABBK's sibling affiliates include Abengoa Bioenergy Company, LLC ("ABC"), Abengoa Bioenergy Engineering & Construction, LLC ("ABEC"), Abengoa Bioenergy Trading, LLC ("ABT"), and Abengoa Bioenergy Outsourcing, LLC ("ABO"), all of whom are part of the bioenergy group and Chapter 11 debtors in Missouri (collectively the "Missouri Debtors"). Many of the U.S. Abengoa bioenergy affiliates did business with each other, including ABBK with the Missouri Debtors.

- ABBK built a plant in Hugoton, Kansas, as a demonstration project to be used by its upstream corporate parents to demonstrate their design-build capabilities and new technology developed in the alternative fuels and power cogeneration fields. The initial construction was funded in part by a $95 million grant and a $45 million loan guaranty by the U.S. Department of Energy ("DOE"). ABBK substantially completed the plant in late 2014, but only after extensive cost overruns. ABBK experienced operational and equipment problems, and although the Hugoton plant produced 75,000 gallons of ethanol in 2015, it never approached commercial viability. While ABBK was not intended to be a revenue producer and was not expected to cash flow until the plant construction became operational in 2015, ABBK never generated significant cash flow and the Hugoton plant was never fully operational prior to the bankruptcy filing. In November 2016, ABBK sold the Hugoton plant, its principal asset (a 25-million-gallon capacity, second-generation cellulosic ethanol and cogeneration plant) for approximately $48.5 million.

- ABBK and the Missouri Debtors were managed by the same board of directors and officers, had the same general counsel, and shared back office operations including accounting, legal, administrative, IT and other services. The same law firm, DLA

---

[3] The Bankruptcy Court's findings of fact span approximately 29 pages of its 44-page Opinion. Although the Court only takes a quick look at the merits of Drivetrain's appeal, the Court recognizes that mixed questions of fact and law or legal conclusions contained in the "findings of fact" section, are reviewed under the applicable standard of review (e.g., de novo for legal conclusions) regardless of its placement in the "findings of fact" section.

Piper, represented ABBK, the Missouri Debtors, and the Delaware Debtors[4] in their respective bankruptcy cases, and Armstrong Teasdale is ABBK's co-counsel in both the Kansas and Missouri bankruptcy cases.

- ABBK had written contracts with ABO, ABEC, and ABT. Undisputed testimony, however, explained that these written contracts were prepared only as a formality to satisfy the DOE's requirements for ABBK to obtain the DOE loan guaranty. While Drivetrain had not located the written agreement between ABC and ABBK at the time of trial, ABBK did not deny the existence of that agreement and the consistent treatment of the loans on ABC's and ABBK's books suggested the existence of some form of agreement or protocol.

- ABC holds the largest intercompany claim at $55,044,663.41. ABC did not report any loans payable by ABBK in its 2014 audited financial statement. Significant "lending" only began in 2015 when ABBK had exhausted the DOE funds and grew more reliant on other affiliates and Abengoa, S.A. to fund the completion, start up, and commissioning of the Hugoton plant. Drivetrain offered testimony from Matthew Diaz, a distressed business specialist from FTI Consulting, who prepared a summary of itemized advances and repayments for 2015 between ABBK and ABC. There is only one repayment noted in Diaz's summary—ABBK provided ABC with a $460,000 payment (without interest) in March 2015. No further payments were made or, based on the record before the Bankruptcy Court, demanded. ABC booked credit transactions and funds deposited in ABBK's accounts as loans, akin to operating loans without interest, repayment, and maturity terms. ABBK's Executive Vice President described the flow of funds as follows: ABBK would ask ABO for money for some purpose. If ABO could not source that money domestically, it would request a draw from Central Treasury in Seville, Spain. If approved, the funds would be disbursed to ABC, who would then disburse the funds to ABBK. He described ABBK as being "totally one hundred percent dependent on . . . the affiliates and the corporate entity." By 2015, ABBK requested funds for utilities and other essential services "to keep the lights on." Drivetrain's 30(b)(6) representative described ABC's essential function "as the bank for the [b]ioenergy companies."

- ABEC provided engineering and construction management services to ABBK under a written agreement and holds a claim for $1,883,354.84. The agreement provided for services to be rendered and billed monthly with set hourly rates to be charged by ABEC depending on the nature of the services rendered. Monthly invoices would be submitted and were payable within two days of billing. The invoices referenced in Diaz's report contained summaries of amounts billed, but no hourly charge detail or

---

[4] Abengoa and several of its Spanish subsidiaries and affiliates filed a proceeding under Article 5bis of the Spanish Insolvency Act. This foreign proceeding was recognized in a Chapter 15 filing in Delaware. Abeinsa Holding Inc. and other related subsidiaries and affiliates (including ABHK) filed voluntary Chapter 11 cases in the District of Delaware in late March and early April of 2016.

description of services. And it did not appear that ABEC ever made a demand for payment, even though all amounts were payable on net two-day terms.

- ABT has a claim for $10,905,104.17 under its contract to procure and supply ABBK with biomass for the plant. ABBK did not make any payment on the parties' September 18, 2013, contract from August 2014 forward. ABT invoiced ABBK for each shipment of biomass during that period—some of its invoices included a contractual $1/ton fee, and others did not include this contractual fee. Had ABT not paid for the biomass it delivered, its suppliers would have been unsecured creditors of ABBK.

- ABO filed a claim for $1,617,790.74 for operation and financial services rendered to ABBK. Under the parties September 13, 2013, agreement, ABO was to provide ABBK a suite of services that included human resources, office furniture and rent, IT services, legal services, insurance, and aviation. The agreement would remain in effect until December 31, 2028, or the termination of the DOE loan guaranty agreement. The agreement fixed an annual fee of $535,000—an amount to be adjusted in subsequent years—and ABBK made no payments to ABO during the year preceding the bankruptcy filing.

- The Missouri Debtors' intercompany claims are different from those of non-affiliate Class 2 creditors.

- The Missouri Debtors' claims have several things in common: (1) all arose while they shared management with ABBK and knew the status of the Hugoton plant and ABBK's financial condition, (2) three, if not four, of them are grounded on written contracts required by the DOE as a condition of its loan guaranty to ABBK—nothing suggested they were the product of any arm's length bargaining, (3) the liquidation of each is based on book entries, e-mail threads, wire transfers, and in some cases, other source documents such as invoices, (4) only the issuing of invoices and direct payments make these claims look similar to ordinary trade creditor claims, (5) despite scrupulous documentation, no documented demands for payment or collection efforts were made, and (6) none of the affiliates harbored any expectation of payment from ABBK, even when the obligations were incurred.

- No prepetition efforts were made by ABT to collect for the biomass it delivered; likewise, ABC, ABEC, and ABO took no measures to collect or enforce the debtor's obligations to them. The affiliates knew of ABBK's condition when debts were incurred, they understood ABBK's dependence upon them, and they understood that ABBK was a demonstration project—not a revenue-producing entity like other bioenergy affiliates that operated first generation plants. This understanding was facilitated by the board meetings among the shared leadership of the entities at which ABBK's condition was discussed. ABBK's Executive Vice President testified that ABBK and the other bioenergy affiliates operated in an integrated manner, which included sharing the same management.

- The proponents of the plans in the Missouri and Delaware bankruptcy proceedings, with few exceptions, separately classified intercompany claims below unsecured third-party claims and denied payment of those claims. The Delaware plan denied distribution to any intercompany claims except that ABC's claim against ABHK was reserved. The Missouri plan subordinated all intercompany claims and denied them distribution, except for distributions to ABBK on account of its claims. ABBK's Plan subordinates all intercompany claims with no exceptions.

- ABBK's Executive Vice President testified that the complexity of intercompany transfers made it more expeditious to classify them below third-party claims. He also testified that none of the affiliates ever expected to be paid, particularly after the beginning of 2015 when the Hugoton project became plagued with problems and "everybody" knew it would not be profitable. Although Timothy Daileader, Drivetrain's principal, also testified as to the reasons for different treatment of intercompany claims in the Missouri and Delaware bankruptcy cases, the Bankruptcy Court accepted ABBK's Executive Vice President's testimony regarding why it separately classified intercompany claims.

- Drivetrain argued that the Missouri Debtors' claims were based on extensions of credit to ABBK, without which ABBK would have been forced to rely on third-party credit, making these claims the equivalent of non-affiliate claims. Given ABBK's start-up status, however, unsecured third-party credit likely would not have been available to ABBK, and ABBK's assets could not be encumbered without the DOE's consent. ABBK's affiliates were its only likely sources of working capital or operating credit.

- Drivetrain's distressed business specialist, Diaz, testified that the intercompany claims were incurred for valid contractual obligations and because ABBK's books and records reflected as much, they should be treated on par with non-affiliate claims. He relied on internal records to show that ABC tracked fund outlays to ABBK, accrued interest on these outlays, and, from time to time, requested their repayment. These outlays were consistently booked as "short term loans." Diaz did not go back to Spain to view the flow of money among the 700 entities. He did not consider the relationship among the affiliates as complex or unusual, and opined that the claims were "good claims."

- ABBK and the Kansas Committee stipulated to the terms of an order providing for a Key Employee Incentive Program ("KEIP"), which included that all intercompany claims were to be subordinated to the claims of trade creditors. While the Missouri Debtors were not party to the stipulation, their plan recognized the Kansas KEIP priority over the Missouri creditors. It provided that any funds recovered from ABBK's estate by the liquidating trustee on account of the Missouri Debtors' claims would be paid only after the KEIP claims are paid. The Missouri Debtors' plan, as corrected, was filed before ABBK's Plan and provides for the subordination of all intercompany claims (except those of ABBK).

- The similarity of the plan and release provisions in the other bankruptcy proceedings involving Abengoa entities supports ABBK's contention that, at least among the debtors, there was an understanding that each other's debts would be released and not paid (except where specified). The ABBK Plan release, however, is the only release to specifically refer to intercompany or affiliate claims. ABBK's Executive Vice President testified that subordination of intercompany claims was "part of the strategy from the beginning . . . that the [shared bioenergy] management team had from the time that these cases were filed, probably from the beginning of 2016." This consensus, reached among ABBK's Executive Vice President, the companies' CEO at the time, general counsel of the bioenergy group, and possibly one other person, was not reduced to writing, but was "reflected in the disclosure statement." This testimony was uncontroverted.

- The evidence of a subordination agreement is not based solely upon the testimony of ABBK's witness. Sam Star, Drivetrain's Rule 30(b)(6) designee, acknowledged that, given the experimental nature of the Hugoton project, the intercompany claimants expected repayment of the intercompany obligations only if and when the plant was completed and became operational. That did not occur. The Missouri Debtors' continuation to fund ABBK when they knew the state of ABBK's affairs is circumstantial evidence consistent with the subordinated treatment of affiliates' intercompany claims.

- ABBK proved that its motivation to separately classify and treat the Missouri Debtors and other affiliate intercompany creditors' claims was sincere.

The Bankruptcy Court rejected Drivetrain's legal arguments in opposition to confirmation of the Plan. First, it held that separate classification of the affiliate intercompany claims is permissible under 11 U.S.C. § 1122(a) as "[n]othing in the bankruptcy code prohibits the separate classification of like claims into different classes so long as that is not done for the purpose of gerrymandering voting on the plan." The Bankruptcy Court found that ABBK demonstrated both (1) the uniqueness of the affiliate claims by virtue of their shared ownership, management, and objectives, as well as (2) the subordination understanding among the affiliates.

Second, it held that the Plan did not separately classify the intercompany claims for the purpose of gerrymandering. In rejecting Drivetrain's gerrymandering argument, the Bankruptcy Court noted that the intercompany claims were separately classified because they are dissimilar

from the third-party trade creditor claims, and alternatively, even if they were substantially similar, there is no evidence that the separate classification was motivated by gerrymandering. Rather, when the Plan was filed, the Missouri Debtors remained debtors in possession, were still managed by the same individuals as ABBK, shared the same general counsel, and were represented in court by the same lawyer. When the Plan was filed, the shared management team agreed to the proposed classification and treatment of intercompany claims. Thus, there was no tactical reason for ABBK treat a "blocking" unsecured claim differently. Also, the Plan honored an agreement that third-party trade creditors and vendors would be paid ahead of intercompany claims.

Third, the Bankruptcy Court held that ABBK's Plan satisfied the best interests of creditors test under § 1129(a)(7). It held that "[e]ven without considering whether the Delaware, Missouri, and Kansas debtors agreed that intercompany debt would be subordinated, my 'rational speculation' must certainly include the likelihood that a chapter 7 trustee would question paying the claims of four affiliated companies who shared information, management, and objectives at par with unaffiliated and less informed third-party creditors." Further, based on its factual conclusion that ABBK shared an intention with the Delaware and Missouri debtors to subordinate the claims, the Bankruptcy Court concluded that said agreement would be honored under § 510(a).

Fourth, the Bankruptcy Court concluded that the separate classification of intercompany claims below general unsecured claims does not amount to unfair discrimination in violation of § 1129(b)(1) under any of several tests typically employed by courts in this and other circuits. Fifth, it concluded that the Plan complies with the absolute priority rule found in § 1129(b)(2)(B) because creditors in class 4 will not receive any proceeds or distributions under the Plan. Finally, the Bankruptcy Court found that the Plan was proposed in good faith and complies with all requirements of § 1129(a), (b)(1), and (b)(2).

*Drivetrain's Motions to Stay*

As required by Fed. R. of Bankr. P. 8007, Drivetrain filed with the Bankruptcy Court a motion to stay implementation of the confirmation Order pending appeal. After recognizing the applicable factors governing motions to stay, the Bankruptcy Court concluded that none of the factors weighed in favor of granting a stay and denied Drivetrain's motion.

Drivetrain elected to have its appeal of the Bankruptcy Court's decision heard by this Court, pursuant to Fed. R. Bankr. P. 8005, and on March 30, 2018, filed a Motion for Stay Pending Appeal (Doc. 24) and an Emergency Motion for Temporary Stay, and for Expedited Briefing and Hearing (Doc. 28). After holding a teleconference on April 6, 2018, to address Drivetrain's emergency motion, the Court denied Drivetrain's emergency request for a temporary stay, but granted its request for expedited briefing on its Motion for Stay Pending Appeal. On June 12, 2018, the Court denied Drivetrain's Motion for Stay Pending Appeal.[5]

In denying Drivetrain's request for a stay, the Court found that Drivetrain failed to meet its burden to show a strong likelihood of success on the merits of its appeal, that Drivetrain failed to show that it would suffer irreparable injury in the absence of a stay, that the balance of harm to other parties did not weigh in favor of or against imposing a stay, and that the public interest weighed against imposing a stay.

*The ABBK Trustee's Motion to Dismiss*

One day after the Court denied Drivetrain's request for a stay, the ABBK Trustee filed a Motion to Dismiss Drivetrain's appeal as moot. The ABBK Trustee argues that Drivetrain's

---

[5] *See* Doc. 52.

appeal should be dismissed under the doctrines of constitutional and equitable mootness.  It argues that all six of the equitable mootness factors weigh in favor of dismissal.

The ABBK Trustee submitted an affidavit in support of its Motion stating that he has entered into binding consulting agreements with four former employees of or consultants to ABBK, issued distributions from the assets of the ABBK Liquidating Trust in full payment of administrative claims and priority claims of ABBK that were Allowed within the meaning of the Plan, and issued interim distributions from the assets of the ABBK Liquidating Trust in the amount of 50 cents on the dollar to holders of Class 2 General Unsecured Claims that were Allowed under the Plan.[6]  The ABBK Trustee represents that the majority of the assets remaining in the trust constitute reserves for (1) several disputed claims, (2) administrative expenses of the ABBK Liquidating Trust, and (3) accrued, unpaid professional fees incurred by ABBK and the Official Committee of Unsecured Creditors prior to March 30, 2018.  It does not anticipate recovery of material additional assets and asserts that "very little else" remains to be done before the trust is fully administered.[7]

In its response,[8] Drivetrain argues that its appeal is not constitutionally moot, that the Court should not apply the equitable mootness doctrine in a Chapter 11 liquidation case, that even if the Court applies the equitable mootness doctrine it should not dismiss the appeal, and that even if the

---

[6] These distributions included distributions to three landowners to assist in paying the costs of environmental remediation of tens of thousands of tons of biomass that ABBK abandoned on leased properties.

[7] It represents that the remaining actions include: (1) resolution of a handful of disputed claims, (2) payment of accrued, unpaid professional fees upon approval by the Bankruptcy Court, and (3) the issuance of final distributions to holders of Allowed Class 2 General unsecured Claims from any remaining cash.

[8] The Court adopted the parties' proposed Agreed Order which extended Drivetrain's deadline to file its response until after the conclusion of discovery relating to the motion to dismiss.  Docs. 58, 58-1.

equitable mootness factors weigh in favor of dismissal, dismissal should be denied because the ABBK Trustee has unclean hands.

### III.  Analysis

**A.  Constitutional mootness**

In less than one page, and without factually supporting its argument, the ABBK Trustee argues that Drivetrain's appeal is constitutionally moot because there is no available relief for Drivetrain. "[A]n appeal of a bankruptcy court's decision will only be constitutionally moot if the appellee demonstrates that a court could order no meaningful relief to the party seeking reversal of the bankruptcy court's decision."[9]  "[I]f a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot."[10] As noted by Drivetrain and not contested by the ABBK Trustee, several million dollars remain in the bankruptcy estate.  Thus, at a minimum, Drivetrain may be entitled to a share of the funds remaining after the payment of disputed claims, administrative expenses, and accrued but unpaid professional fees without unravelling any of the transactions consummated to date.  Drivetrain does not lack *any* relief.  Indeed, if successful on its appeal, Drivetrain may not obtain all of the relief it seeks, but it is not without any meaningful relief whatsoever.  The ABBK Trustee has not demonstrated that this Court can order no meaningful relief to Drivetrain if Drivetrain were to succeed on its appeal.  Accordingly, this case is not constitutionally moot.

---

[9] *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 584 F.3d 1327, 1330 (10th Cir. 2009).

[10] *Id*. at 1336.

## B.  Equitable mootness

"Equitable mootness occurs where 'even though effectual relief could conceivably be fashioned, implementation of that relief would be inequitable.' "[11]  The doctrine of equitable mootness is limited in "scope and the party that wishes the court not to decide the merits of an appeal bears the burden of proof."[12]  Before the Court may "avoid reaching the merits of a bankruptcy appeal under" this doctrine, it must consider six factors.[13]  While the parties disagree as to how to weigh each factor, they agree that these factors include:

> (1) Has the appellant sought and/or obtained a stay pending appeal?
>
> (2) Has the appealed plan been substantially consummated?
>
> (3) Will the rights of innocent third parties be adversely affected by reversal of the confirmed plan?
>
> (4) Will the public-policy need for reliance on the confirmed bankruptcy plan—and the need for creditors generally to be able to rely on bankruptcy court decisions—be undermined by reversal of the plan?
>
> (5) If appellant's challenge were upheld, what would be the likely impact upon a successful reorganization of the debtor?  And
>
> (6) Based upon a quick look at the merits of appellant's challenge to the plan, is appellant's challenge legally meritorious or equitably compelling?[14]

"These six factors are not necessarily conclusive, nor will each factor always merit equal weight."[15]

The party seeking dismissal under the doctrine of equitable mootness "carries the burden of

---

[11] *Rafter Seven Ranches L.P. v. WNL Invs. (In re Rafter Seven Ranches L.P.)*, 414 B.R. 722, 741 (10th Cir. B.A.P. 2009) (quoting *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 306 (10th Cir. B.A.P. 2006)).

[12] *Search Mkt. Direct*, 584 F.3d at 1331.

[13] *Id.*

[14] *Id.* at 1339.

[15] *Id.*

showing that the answers to the six questions discussed above demonstrate that it would be unfair or impracticable to reverse the confirmed plan."[16]

Before addressing the relevant factors, the Court first considers Drivetrain's argument that the Court should not apply the doctrine of equitable mootness in the context of a Chapter 11 liquidation, as opposed to a Chapter 11 reorganization. The Court disagrees that the doctrine of equitable mootness has no place in a Chapter 11 liquidation. First, as recognized by the Tenth Circuit, "the basis of a dismissal under equitable mootness . . . is that a weighing of the equities— and particularly the interests of innocent parties—suggests that the more equitable approach is for the court to decline to hear a challenge to the plan."[17] Given that the doctrine's main purpose is to protect the interests of innocent third parties, the Court finds the distinction between reorganizations and liquidations insufficient to adopt a blanket rule against applying the equitable mootness doctrine in Chapter 11 liquidation cases. The interests of innocent third parties may be inequitably harmed in either type of Chapter 11 proceeding. Second, the Tenth Circuit has previously affirmed dismissal of an appeal under the doctrine of equitable mootness in the context of a Chapter 11 liquidation.[18] Given the reasons underlying the doctrine, as well as the Tenth Circuit's prior application of the doctrine in a Chapter 11 liquidation context, the Court declines Drivetrain's invitation to adopt a blanket rule that the doctrine of equitable mootness does not apply in Chapter 11 liquidation cases.[19]

---

[16] *Id.* at 1340.

[17] *Id.* at 1330 n.1.

[18] *Sutton v. Weinman (In re Centrix Fin. LLC)*, 394 F. App'x 485, 493 (10th Cir. 2010).

[19] In *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 587 (D. Del. 2009), relied upon by Drivetrain in support of this argument, the court noted the differences between liquidation and reorganization plans, but continued to analyze whether the doctrine of equitable mootness required dismissal in the context of a liquidation plan. *Id.* It did not conclude that the doctrine has no application in the context

1.    *Failure to obtain a stay*

The stay factor "involves two questions: (1) Did the party seeking reversal try to obtain a stay?  (2) Assuming the party seeking reversal sought a stay, was that party successful in obtaining a stay pending appeal?"[20]  The Tenth Circuit has recognized that different courts place different emphasis on these questions, but has concluded that both questions are significant.[21]  Courts should "be less inclined to apply the doctrine" when the appellant has obtained a stay or if the appellant unjustifiably fails to seek a stay, but "more inclined to accommodate an appellant who has diligently but unsuccessfully pursued a stay pending appeal."[22]  "Where a party has sought a stay from both the bankruptcy and district courts, the party's failure to appeal that decision . . . will not, without more, render an appeal of the merits moot."[23]

Here, Drivetrain sought a stay from both the Bankruptcy Court and this Court, and it appealed this Court's denial of its request for a stay.  Thus, the first question favors Drivetrain's position.  Even though Drivetrain sought a stay, however, it was not successful in that endeavor.  Accordingly, the second question favors the ABBK Trustee's position.[24]  Since one of the relevant

---

of a Chapter 11 liquidation plan.  Rather, it noted that the equitable mootness factors must be applied with the "liquidation context in mind."  *Id.*  Other circuits to address whether equitable mootness applies to a Chapter 11 liquidation plan have concluded that it does.  *See, e.g.*, *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102, 109 (2d Cir. 2014) (collecting cases and holding "that the doctrine of equitable mootness . . . appl[ies] in assessing appeals related to Chapter 11 liquidation proceedings as well as Chapter 11 reorganizations").

[20] *Search Mkt. Direct*, 584 F.3d at 1340.

[21] *Id.* (noting that some cases place greater emphasis on whether the appellant pursued all available remedies to obtain a stay and others find that a failure to obtain a stay and a stay sought and denied lead to the same result) (citations omitted).

[22] *Id.* at 1340-41.

[23] *Id.* at 1341.

[24] *See id.* at 1340.  Indeed, Drivetrain's failure to obtain a stay resulted in consummation of the Plan as if Drivetrain never sought to stay proceedings.  *See Sw. Bell Tele. Co. v. Long Shot Drilling, Inc. (In re Long Shot*

questions under this factor favors Drivetrain's position and the other favors the ABBK Trustee's position, the Court concludes that this factor weighs neither in favor nor against dismissal under the doctrine of equitable mootness.

### 2. Substantial consummation

The Tenth Circuit "adopted the 'substantial consummation yardstick because it informs [the Court's] judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties.' "[25] The fact that the Plan has been substantially consummated, or that the appellant concedes this fact, however, "is not dispositive of [this Court's] analysis of whether the doctrine of equitable mootness should prevent the court from reaching the merits of [the] appeal."[26] Indeed, while "substantial consummation of a bankruptcy plan may make providing relief difficult, and may raise concerns about fairness to third parties," courts may "order divestiture or damages in situations where business deals or bankruptcy plans have been wrongly consummated."[27]

The ABBK Trustee's affidavit establishes that the Plan has been substantially consummated and Drivetrain does not dispute this assertion. Instead, it argues that this factor should carry very little weight in the Court's analysis because the transactions at issue involve

---

Drilling, Inc.), 224 B.R. 473, 480-81 (10th Cir. B.A.P. 1998) ("[A] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan . . .") (quotation and alteration omitted).

[25] Search Mkt. Direct, 584 F.3d at 1341 (quoting Fed. Commc'ns Comm'n v. GWI PCS 1 Inc. (In re GWI PCS 1 Inc.), 230 F.3d 788, 801 (10th Cir. 2000)).

[26] Id. at 1342 (citations omitted).

[27] Id. (quotation omitted).

"nothing but the distribution of cash assets" which could be disgorged.[28]  While the Plan here may not be as complicated as other Chapter 11 plans, a review of the record suggests that numerous transactions have transpired and that unwinding those transactions will not prove nearly as simple as alleged by Drivetrain.  Further, this case is not similar to the Tenth Circuit's decision in *Search Market Direct*, where the appellant primarily sought to undo one transaction and the party most likely to suffer injury played a pivotal role in the bankruptcy proceedings and was alleged to have engaged in bad-faith dealings with the debtor and trustee.[29]  Rather, unwinding the transactions consummated to date will likely prove troublesome and result in the consumption of substantial time and resources, and as addressed below, would cause harm to innocent third parties.  Drivetrain does not contest that the Plan has been substantially consummated and the Court disagrees with Drivetrain's assertion that this factor should carry "very little weight."  This factor weighs in favor of equitable mootness.

### 3.     *Effects on innocent third parties*

This factor typically serves as "the foremost concern" in analyzing whether to apply the doctrine of equitable mootness.[30]  The ABBK Trustee argues that without disgorgement from third parties, reversal of the Confirmation Order would accomplish nothing, and that

---

[28] Relying on *Search Market Direct*, Drivetrain also argues that the Court should be less inclined to dismiss this appeal given that the third-party creditors had notice of its objection to the Plan and this appeal and because the ABBK Trustee accelerated the consummation of the Plan despite his knowledge of the pending appeal.

[29] *Id.* at 1343, 1347 (noting that the appellant "primarily seeks to undo the sale of the domain name to ConsumerInfo, which is not likely to be particularly complex or troublesome," that "the party most likely to be injured by an undoing of the Joint Plan is ConsumerInfo," that ConsumerInfo has been the "main antagonist . . . intimately involved in the entire convoluted history of this bankruptcy proceeding," and that the appeal involved "troubling allegations of bad-faith dealings between the debtor, ConsumerInfo, and the trustee").

[30] *Id.* at 1343 (citation omitted).

disgorgement would unfairly impact third-party creditors not currently before this Court as these innocent third parties will suffer the brunt of the harm that would flow from reversing the Bankruptcy Court. The ABBK Trustee also notes that some of the funds distributed are being used to assist in paying the costs of the environmental remediation of tens of thousands of tons of decaying and flammable biomass abandoned by ABBK.

Drivetrain argues that the third-party creditors did not "[take] the distributions 'innocently' such that it would be inequitable for the Court to order that their payments be disgorged." While Drivetrain offers arguments specific to only three third-party creditors— Greensill, Stoppel Dirt, and Greg Morris—it argues that no "innocent" third-party creditors exist because each creditor took distributions with knowledge of Drivetrain's objections to the Plan and with notice of Drivetrain's appeal.

To support its argument, Drivetrain relies on one Tenth Circuit decision, *Search Market Direct*, and two decisions from other circuit courts.[31] The Tenth Circuit's decision in *Search Market Direct* involved two parties—ConsumerInfo and SMDI—and each had proposed competing plans to administer the bankruptcy estate with the end goal of acquiring the right to own and use a specific domain name, the most valuable asset of the estate.[32] The

---

[31] *See JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. Inc. (In re Transwest Resort Props., Inc.)*, 801 F.3d 1161 (9th Cir. 2015); *Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*, 624 F.3d 274 (5th Cir. 2010).

[32] The Tenth Circuit described the factual background as follows:

This case presents a somewhat unsettling—but we suspect common—set of facts. Two competing parties . . . have proposed plans to administer [the] bankruptcy estate. However, while both of these plans were crafted to be protective of the creditors' interests, neither of these parties is really interested in ensuring that the creditors are paid off. Rather, as the bankruptcy court observed, the proponents' true intentions throughout this case have been to acquire the right to own and use the FreeCreditScore.com Domain Name, the estate's most valuable asset. To that end, both ConsumerInfo and SMDI purchased substantial portions of the creditors' claims against the estate,

-18-

trustee preferred ConsumerInfo's proposed plan, and the two filed a Joint Plan.[33]   The

Bankruptcy Court held that the Joint Plan should be confirmed and rejected SMDI's claims

to the contrary; SMDI appealed.   Ultimately, the Tenth Circuit concluded that ConsumerInfo,

the party most likely to be injured by reversal, was not an innocent bystander because it was

"intimately involved in the entire convoluted history of [the] bankruptcy proceeding," played

a "pivotal role in the bankruptcy proceedings," served as the "main antagonist" in the

bankruptcy proceeding, and knew "of MSDI's continuing objection to the consummation of

the Joint Plan."[34]  The Tenth Circuit also noted the troubling nature of the "allegations of bad-

faith dealings between the debtor, ConsumerInfo, and the trustee."[35]

Drivetrain's attempts to paint Greensill, Stoppel Dirt and Morris in a light similar to

ConsumerInfo fail.  With regard to Greensill, Drivetrain argues that counsel for Greensill sent

several emails to counsel for the Unsecured Creditors' Committee ("UCC") after the

confirmation hearing and concerning the confirmation process, that Greensill coordinated

---

thereby gaining the authority to propose bankruptcy plans for the estate that would further their
respective desires to acquire the FreeCreditScore.com domain name.

*Search Mkt. Direct*, 584 F.3d at 1330 (quotation marks, alterations, and internal citations omitted).

[33] *Id*. at 1332.

[34] *Id*. at 1343.

[35] *Id*. at 1347.  The other cases cited by Drivetrain also addressed third-parties heavily involved in the
bankruptcy proceedings.  *See JPMCC 2007-C1 Grasslawn Lodging*, 801 F.3d at 1169 (concluding that SWVP, the
owner of the reorganized debtors, was not an innocent third party in light of its participation at every stage of the
proceedings and noting that "SWVP became involved in the reorganization as a new investor and as the proposed
owner of the reorganized entity before the confirmation of the plan," it "participated in the hearings held by the
bankruptcy court regarding confirmation of the plan, and the bankruptcy court acknowledged that it considered
SWVP's pleadings in reaching its decision to confirm the plan," it negotiated over the final form of the confirmation
order, and filed a notice of appearance as appellee in the earlier stage of the appeal in the district court); *Bank of N.Y.
Trust Co. NA*, 624 F.3d at 278 (finding that MRC and Marathon should not be considered third parties as Marathon
partnered with another company to propose a reorganization plan, that Marathon and MRC "effectively purchased the
reorganized companies out of bankruptcy," and that MRC and Marathon presented expert testimony at hearings on
the proposed plan).

with the UCC to respond to Drivetrain's objection to Greensill's claim and to prepare for a court appearance scheduled for April 12, 2018, and that Greensill and the ABBK Trustee negotiated a stipulation regarding Greensill's claim that reminded Greensill that Drivetrain's objections were never resolved on the merits.

The Court has reviewed the exhibits and citations offered by Drivetrain in support of its assertions and they do not support a finding that Greensill was intimately involved with the bankruptcy proceedings, played a pivotal role in the bankruptcy proceedings, served as a main antagonist in the proceedings, or served in any capacity other than a third-party creditor interested in the outcome of proceedings in which it did not substantially participate. Indeed, almost all of the emails cited by Drivetrain occurred after the Bankruptcy Court's February 8, 2018, Opinion overruling Drivetrain's objection to the Plan, confirming the Plan, and ordering the parties to confer and submit an order confirming the Plan.[36] While Greensill's counsel appeared at the confirmation hearing by phone, he did not question witnesses, introduce evidence, make any argument, or otherwise participate in the hearing.[37]

The alleged "coordination" between Greensill's counsel and the UCC appear to have occurred because Drivetrain filed an objection to Greensill's claim on February 16, 2018. A review of the communications does not suggest that Greensill is not an innocent third party for purposes of equitable mootness.[38] Finally, a review of the documents cited by Drivetrain

---

[36] The communications prior to the Bankruptcy Court's Opinion lacked any real substance. *See, e.g.*, Docs. 62-6, 62-7 (inquiring whether counsel for the ABBK Trustee had any idea on when an order from the confirmation hearing may be entered).

[37] Counsel's only "participation" in the hearing was saying, "Yes. Good morning, Your Honor," when asked if he was on the phone.

[38] The communications between Greensill's counsel and counsel for the UCC generally included: (1) the UCC's action in forwarding Greensill notice of Drivetrain's objection to Greensill's claim, (2) discussions regarding the merits of the objection and planning a call to discuss the objection, (3) requesting documents to assist Greensill in

regarding the negotiated stipulation between Drivetrain and Greensill, as well as the June 10 email, does not suggest that Greensill is not innocent. At most, these communications show that Greensill had notice that Drivetrain may challenge Greensill's claim at some point if it succeeded on the merits of its appeal, but the Court does not agree that this is sufficient to strip Greensill of its status as an innocent third party. Drivetrain's arguments regarding Greensill's innocence lack merit.

Drivetrain argues that Stoppel Dirt actively participated in the Plan confirmation process because its CEO was the chair of the UCC. Drivetrain has not asserted facts sufficient for this Court to entertain its argument that Stoppel Dirt cannot be considered an innocent third-party creditor simply because its CEO served as the chair of the UCC. Further, even if the Court accepted this proposition—which it does not—Stoppel Dirt's distributions and potential future distributions constitute only a fraction of the distributions made to date and do not justify negatively impacting the remaining innocent third-party creditors who will unjustly suffer adverse consequences in the event of a reversal.

Drivetrain also argues that Morris cannot be considered innocent because his counsel attended a hearing before Judge Nugent to oppose Drivetrain's motion for a stay pending appeal. Morris' counsel appeared at the hearing in opposition to the motion to stay and noted his client's concern regarding the timing and dilution of the estate. Counsel represented that ABBK had abandoned 38,000 tons of biomass on his clients' properties, noted that his clients were receiving pressure from the Kansas Department of Health and Environment and other

---

responding to the objection, (4) discussing whether the UCC or Debtor intended to object to Drivetrain's standing to object to Greensill or other creditors' claims, (5) discussing the Bankruptcy Court's Order on the deficiency of a motion and whether the ABBK Trustee intended to refile the motion and asking to discuss the same, and (6) discussing whether a hearing scheduled for the following day would be adjourned.

governmental officials, and expressed concerns regarding the fire hazard posed by the biomass in light of weather conditions in Kansas. The Court does not conclude that Morris' limited involvement in the post-confirmation bankruptcy proceedings removes his status as an innocent third party.[39] And, as with Stoppel Dirt, Morris' claim represents only a small fraction of the distributions made to date and does not justify adversely affecting the other innocent third-party creditors.

Finally, the Court rejects Drivetrain's unsupported assertion that notice alone suffices to deprive a third-party creditor of its status as an "innocent" third party. The cases cited by Drivetrain do not stand for this proposition and adopting Drivetrain's argument would effectively disallow the Court from considering the adverse consequences a reversal would have on any third-party creditors since all creditors would have notice of the bankruptcy court's docket. This proposition conflicts with Circuit precedent as the Tenth Circuit has specifically recognized that some third-party creditors may be innocent while others are not, and that courts should concern themselves primarily with the effects on innocent third-party creditors.[40]

It is only where creditors can no longer be deemed "innocent" that the Court will disregard the potential adverse effects a reversal on appeal may have on those creditors. Unlike the cases cited by Drivetrain, nothing currently before the Court suggests that

---

[39] This is especially true where Morris opposed the stay in order to obtain distributions to remove a fire hazard and where Morris played no active role in the proposal or confirmation of the Plan.

[40] *See Search Mkt. Direct*, 584 F.3d at 1345-48 (discussing fact that $1.45 million had been paid to "innocent third party creditors and taxing authorities," noting that the Court's analysis was primarily concerned with those payments, and concluding that "very little risk" existed that "the court would need to unwind any of the payments that have been made to innocent third-party creditors").

Greensill, Stoppel Dirt, Morris, or any other third-party creditor has acted in a manner such that it should not be considered an innocent third party.[41]  Rather, the Court concludes that granting the relief requested by Drivetrain would primarily adversely affect innocent third parties.  Accordingly, this factor weighs strongly in favor of dismissal under the doctrine of equitable mootness.[42]

### 4.    *Public policy and finality*

"This factor 'reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him.' "[43]  The Tenth Circuit has recognized the importance of finality and noted that remand may not be proper on public policy grounds, even in "the absence of a nightmarish situation for the bankruptcy court on remand."[44]  While the public policy interest in finality of bankruptcy court decisions is great, countervailing concerns may outweigh this interest in certain circumstances.  Indeed, "the seriousness of the appeal allegations" may constitute a "countervailing concern that could weigh against a determination of equitable mootness."[45]  For example, interests in finality may be

---

[41] Indeed, none of the actions attributed to Greensill, Stoppel Dirt, or Morris even begin to approach the level of involvement or the roles played by the parties found not to be innocent in the cases cited by Drivetrain.

[42] Drivetrain's arguments regarding whether disgorgement is an available remedy do not change this Court's view as to the unfairness of the remedy of disgorgement.

[43] *Id.* at 1347 (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs.*, 956 F.2d 1065, 1069 (11th Cir. 1992)).

[44] *Sutton*, 394 F. App'x at 492 (10th Cir. 2010) (rejecting contention that "the district court was compelled to conclude that their right to appeal outweighed the public-policy interest in finality" where the district court recognized that "unscrambling the egg" would not likely be complicated in the case at hand).

[45] *Id.* at 492 (quotation marks and quotation omitted).

outweighed where an "appeal raises troubling allegations of bad-faith dealings between the debtor . . . and the trustee, and of a lack of disinterestedness on the part of the trustee."[46]

Here, the allegations in Drivetrain's appeal do not present "troubling allegations of bad-faith dealings," matters that go "to the integrity of the bankruptcy process," or issues that otherwise implicate a serious reason for why the Court should reach the merits.[47]  Granting reversal of the Plan would adversely affect the public policy need for finality and reliance on the confirmed Plan, and no countervailing interests outweigh this public policy.  Accordingly, in balancing the respective interests here, the Court concludes that this factor weighs in favor of dismissal under the equitable mootness doctrine.

>    5.    *Impact upon the likelihood of a new reorganization*

"A 'successful reorganization' is ordinarily 'one from which the debtor emerges as an economically viable operation.' "[48]  The Plan here, however, involves a liquidation of ABBK's assets.  Thus, Drivetrain argues that this factor weighs in its favor since no reorganization has occurred or will occur in this case and the factor only applies to reorganizations.

The ABBK Trustee submits that the Court should follow the Tenth Circuit's lead in *Sutton* and determine that this factor weighs in favor of equitable mootness since reversal would likely

---

[46] *Search Mkt. Direct*, 584 F.3d at 1347.

[47] *See id*. at 1347; *Sutton*, 394 F. App'x at 494.  To the extent Drivetrain asserts that its "due process" allegations go to the integrity of the bankruptcy process, the Court does not find this argument compelling.  First, a brief look at the merits suggest that this claim lacks merit.  Second, the Tenth Circuit's decision in *Sutton* also included alleged violations of the appellant's due process rights, but the Court nevertheless affirmed dismissal on the basis of equitable mootness.  394 F. App'x at 494.  Likewise, Drivetrain's allegations regarding the Trustee's actions since the confirmation of the Plan do not persuade the Court to weigh this factor in Drivetrain's favor.  The Trustee's *post*-confirmation actions here do not affect the validity of the confirmation Order itself, and regardless, the Court is not persuaded that the Trustee acted improperly in implementing the Plan.

[48] *Id*. at 493 (quoting *Sheet Metal Workers' Int'l Assoc. v. Mile Hi Metal Sys., Inc. (In re Mile Hi Metal Sys., Inc.)*, 899 F.2d 887, 893 (10th Cir. 1990)).

lead to the promulgation of a different liquidating plan, but the delay caused by this change would diminish the assets of the state to the detriment of creditors. In *Sutton*, the Tenth Circuit recognized that the case did not involve a reorganization and held that "it was neither arbitrary, capricious, nor whimsical for the district court to consider the impact of a reversal of the confirmed Plan on the relative success, in terms of maximizing the creditors' recovery, of a new liquidation plan."[49]

Although the Tenth Circuit's decision in *Sutton* suggests that this factor, or a version of it, may apply in a liquidation context, neither party cites any caselaw specifically addressing Drivetrain's argument. Ultimately, it is unnecessary to determine whether this factor applies in the liquidation context because even if this factor weighed against dismissal under the equitable mootness doctrine, the remaining factors would outweigh it. Accordingly, the Court declines to determine whether this factor applies here and will assume for purposes of this motion that this factor weighs against a finding of equitable mootness.

6. *Quick look at the merits*

The last factor requires the Court to take a "quick look" at the merits of the appeal. The Court has already performed a similar exercise when it denied Drivetrain's motion to stay. At the motion to stay stage, however, Drivetrain retained the burden to make "a strong showing that [it was] likely to succeed on the merits."[50] Here, the ABBK Trustee, as the party seeking dismissal under the doctrine of equitable mootness, bears the burden to show that the applicable factors weigh in favor of dismissal.[51]

---

[49] *Id.*

[50] *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted).

[51] *Search Mkt. Direct*, 584 F.3d at 1340.

While the ABBK Trustee now bears the burden to demonstrate that the relevant factors weigh in favor of dismal, the Court's view of the merits of this appeal has not changed. The ABBK Trustee has satisfied the Court that Drivetrain's arguments lack merit, and Drivetrain's response does little more than incorporate by reference the arguments this Court has previously found unavailing.[52] For the reasons previously explained by the Court in its Order denying Drivetrain's motion to stay, the Court concludes that the issues addressed therein do not appear meritorious.[53]

Further, the one issue not previously addressed by this Court, even if meritorious, does not tip the scales in favor of reaching the merits of this appeal. Drivetrain argues in that alternative that if the affiliate claims are properly subordinated under the Plan, then the Plan should have designated it to receive distributions in the event assets remain after all other classes have received distributions, and that the Plan improperly designates it to receive nothing. A "quick look" at this issue suggests that the ABBK Trustee holds the stronger position on this issue; however, it is unnecessary for the Court to look too closely at the merits of this claim because even if it is meritorious, the last factor still would not weigh against dismissal. Indeed, if this issue resulted in reversal of the Bankruptcy Court's decision, such that the Plan must allow Drivetrain to receive distributions of any remaining estate assets after all other classes have been paid, Drivetrain would

---

[52] Drivetrain incorporates its arguments from briefing the motion to stay and summarizes the most serious legal errors as including: (1) that its due process rights were violated due to a lack of notice of the alleged basis for treating intercompany claims as junior to non-affiliate claims, (2) several of the Missouri claims at issue preclude the existence of an oral subordination agreement, (3) ABBK's payments to ABO during the bankruptcy case directly conflict with the existence of an oral subordination agreement, (4) the Bankruptcy Court erred in rejecting Drivetrain's contention that the Plan violates the best interest of creditors test, (5) even if the Missouri claims were properly subordinated, the Plan remains unconfirmable because it does not subordinate the claims, but instead pays them zero—a violation of the absolute priority rule and the "best interests of creditors test."

[53] The Court did not substantively address Drivetrain's fifth point of contention. Drivetrain only briefly mentioned this argument in its memorandum in support of motion to stay, and the Court declined to address Drivetrain's argument given that the only real development of the issue appeared in Drivetrain's reply brief.

not likely receive any distribution and the distributions to general unsecured creditors would shrink based on the additional expense of remand. In other words, remanding this case would likely be a futile undertaking that serves only to consume additional estate resources, reduce the distributions to creditors, and not result in Drivetrain receiving any distributions.[54] Thus, even if this issue has merit—which the Court does not conclude—it does not outweigh the lack of merit of the remaining issues and given the likely end result of a reversal based on this issue, the Court concludes that this factor weighs in favor of dismissal.

## C. Unclean hands

Drivetrain argues that this Court should deny the ABBK Trustee's motion because he has unclean hands due to his (1) refusal to reserve funds for the Missouri Claims in violation of the Plan, the Confirmation Order and the Liquidating Trust Agreement, and (2) deliberate attempt to construct support for this motion by hastily distributing estate assets, without conducting customary inquiries or analyses and without an understanding of the largest claim. Drivetrain's allegations fall far short of persuading the Court that the ABBK Trustee has engaged in "conduct involving fraud, deceit, unconscionability, or bad faith."[55]

First, the Plan does not clearly require the ABBK Trustee to reserve funds for Drivetrain's claims, nor does it appear as though the Bankruptcy Code requires such action.[56] Drivetrain notes

---

[54] The Court is not persuaded by Drivetrain's arguments that it would receive distributions even if its claims are subordinated.

[55] Drivetrain alleges that the doctrine of unclean hands applies when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party (5) and affects the balance of equities between the litigants."

[56] *See, e.g.*, *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 961 (2d Cir. 1993) ("But neither the Bankruptcy Code nor tenets of due process require that a reorganized company in effect bond an appeal by a losing claimant.").

that a claim is "Disputed" under the Plan if it is "disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order," and that the Bankruptcy Court's confirmation Order is not "final" given this appeal. Drivetrain offers no support for its contention that the Bankruptcy Court's confirmation of the Plan does not constitute a "Final Order," and the Tenth Circuit recognizes a bankruptcy court's order confirming a plan as a final order.[57] Additionally, treating the Missouri Claims as "Disputed" under the meaning of the Plan would result in absurd consequences given other provisions in the Plan.[58] Finally, even if the ABBK Trustee breached the Plan by failing to reserve funds for the Missouri Claims, this alone does not constitute fraud, deceit, unconscionability, or bad faith, and Drivetrain has failed to identify any further circumstances to allow this Court to find that the ABBK Trustee engaged in such conduct.

Second, the Court has reviewed the exhibits and testimony cited by Drivetrain regarding the ABBK Trustee's alleged hasty distribution of assets without proper analysis or inquiry and concludes that the ABBK Trustee's alleged actions or inactions in administering the Plan post-confirmation do not rise to the level necessary to support a finding that it engaged in conduct involving fraud, deceit, unconscionability, or bad faith.[59] Accordingly, the ABBK Trustee is not

---

[57] *See, e.g.*, *Gordon v. Bank of Am. (In re Gordon)*, 743 F.3d 720, 723 (10th Cir. 2014) (recognizing a "bankruptcy court's order confirming the Gordons' reorganization plan was such a final, appealable order") (citation omitted); *Woolsey v. Citibank, N.A. (In re Woolsey)*, 696 F.3d 1266, 1269-70 (10th Cir. 2012) (noting the confirmation of a plan as a "final order" and that a premature notice of appeal "ripens and becomes effective once a final order approving a plan of reorganization is entered") (quotation and alterations removed).

[58] For example, the Plan states: "[o]n or after the Effective Date, the Liquidating Trustee shall have the authority . . . to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court." If the Missouri Debtors' claims qualified as "Disputed" claims under the Plan, then the ABBK Trustee could settle the claims without violating the Plan, despite the fact that the Plan states that creditors in Class 3 (Intercompany Claims) are to receive "No Distribution."

[59] The Court also re-emphasizes the "foremost concern" of the equitable mootness doctrine—the protection of innocent third parties. *See Search Mkt. Direct*, 584 F.3d at 1343 (citation omitted). While the ABBK Trustee may

prohibited from seeking dismissal under the doctrine of equitable mootness based on the doctrine of unclean hands.

## IV.    Conclusion

While this case is not constitutionally moot, the ABBK Trustee has met its burden to demonstrate that the six factors relevant in determining whether to dismiss an appeal under the equitable mootness doctrine weigh in favor of dismissal.  Four of the six factors definitively weigh in favor of dismissal, including the factor protecting the foremost concern of the Court—whether the rights of innocent third parties will be adversely affected by a reversal.  The Plan has been substantially consummated, reversal would adversely affect innocent third parties, dismissal would serve the public's need for reliance on confirmed bankruptcy plans and no countervailing public policy interest exist to deter the Court from dismissing this action, and a quick look at the merits of this appeal suggests that Drivetrain will not succeed on the merits.

**IT IS THEREFORE ORDERED** that the Motion of Mark D. Kozel, as Liquidating Trustee of the ABBK Liquidating Trust, to Dismiss Drivetrain, LLC's Appeal as Moot (Doc. 53) is **GRANTED**.

---

tangentially benefit from dismissal of this action, it is not the intended beneficiary of dismissal or of the equitable relief afforded by the doctrine of equitable mootness.  Thus, even if the ABBK Trustee had engaged in some questionable conduct after confirmation of the Plan, based on the allegations at issue here, the Court is not convinced that innocent third parties should suffer as a result.  Regardless, the record does not support a finding of unclean hands.

**IT IS SO ORDERED**.

**Appeal dismissed.  Case Nos. 18-CV-1055 and 18-CV-1056 are closed.**

Dated this 10th day of October, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE